IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CV-23-BR

| | |
|---|---|
| MORRIS & ASSOCIATES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| COOLING & APPLIED ) | |
| TECHNOLOGY, INC., ) | |
| ) | |
| Defendant. ) | |

This matter comes now before the undersigned for Memorandum and Recommendation on Plaintiff's Motion for Preliminary Injunction [DE-49]. For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Preliminary Injunction be GRANTED.

## STATEMENT OF THE CASE

Plaintiff, Morris & Associates ("Morris"), is a North Carolina corporation involved in the manufacture and sale of industrial refrigeration equipment for both domestic and worldwide markets. Defendant, Cooling and Applied Technologies ("CAT"), is an Arkansas corporation also involved in the manufacture and sale of refrigeration equipment.

This dispute involves Defendant's alleged infringement of Plaintiff's U.S. Patent No. 7,470,173 ("the '173 patent"), which is entitled "Post Chill Decontamination Tank." The '173 patent was filed on June 13, 2007, subsequent to a Provisional Application for the patent which had been filed on June 13, 2006 (also entitled "Post Chill Decontamination Tank").

The record demonstrates that a problem in poultry processing concerns bacterial contamination. Pl.'s Compl., Ex. A [DE-1]. The "evisceration" process of poultry leaves bird

carcasses particularly vulnerable to salmonella, herpes, and e. coli contaminations. *Id.* Because bacteria grows much more rapidly at warmer temperatures than cold, poultry processors are required to lower the temperature of eviscerated birds from a live body temperature of 90-100° F to less than 40° F shortly after slaughter. *Id.* In the poultry industry, a large device known as a "chiller" is used to accomplish this lowering of body temperatures. *Id.* Chillers are large chambers that pass recently eviscerated birds through cool water until the bird's body temperature drops below 40° F. *Id.* However, chillers do not always adequately reduce bacteria to regulation levels. *Id.*

Plaintiff thus claims it developed its '173 patent and "Post Chill Decontamination Tank" for the purpose of "treat[ing] and reduc[ing] the microbial contamination on the surfaces of the birds after the birds are removed from the chiller." *Id.* The Post Chill Decontamination Tank is a smaller chamber that attaches to the end of an aforementioned chiller tank. *Id.* Once the poultry passes through the larger chiller tank, the chilled poultry exits into Plaintiff's Post Chill Decontamination Tank. *Id.* In this tank, the poultry is submerged and pushed by paddles through a concentration of chemicals that rapidly reduce the bacteria levels of the poultry. *Id.* According to Plaintiff, this results in a cheap, quick, and effective way to reduce the levels of bacteria on freshly slaughtered poultry to regulation levels. *Id.*

Defendant manufactures and sells a device known as the "KillCAT." Pl.'s Mem. in Supp. of Summ. J., Ex. F. [DE-43]. KillCAT is described as a pathogen reduction system made and designed "to meet and exceed the stringent food safety regulations that are in place today." *Id.* The KillCAT system includes a 5 foot tank that sits at the end of a larger chiller tank. *Id.* Birds exit the chiller tank and enter KillCAT before being pushed through a liquid solution by rotating paddles.

2
Case 5:09-cv-00023-BR   Document 69   Filed 07/30/10   Page 2 of 19

Defendant claims the KillCAT is the direct predecessor of the "OzCAT." Def.'s Resp. [DE-54]. There is a dispute as to when the first OzCAT was first on the market,[1] but the record evidences the first OzCAT was installed in September 2005 at a Tyson Foods poultry plant. *Id.* The OzCAT functioned much like the KillCAT, except, it used an ozone generator instead of a chemical bath to treat the water that recently eviscerated/chilled birds would pass through. *Id.* The OzCAT remained at this singular Tyson Foods location until December of 2006, wherein the device was removed. Shortly after giving up on ozone as a method for reducing bacteria levels, CAT decided to use antimicrobial chemicals. Using the same small tank adjacent to the "chiller tank" that they used for OzCAT, they replaced the ozone generator with antimicrobial chemical treatment and monitoring. *Id.* They found this to be much more effective. This soon became Defendant's KillCAT system.

Plaintiff filed its complaint in this action on January 22, 2009, alleging one claim of infringement arising under the patent laws of the United States, Title 35, United States Code and its U.S. Patent No. 7,470,173 ("the '173 patent"). Pl.'s Compl. Specifically, Plaintiff alleges that Defendant's use, sale, import, and offer of the KillCAT system constitute direct, contributory infringement, and/or inducement to infringe one or more claims of Morris' '173 patent in violation of 35 U.S.C. § 271. *Id.* Plaintiff filed a Motion for Summary Judgment on January 13, 2010, [DE-42], and a Motion for Preliminary Injunction pursuant to 35 U.S.C. § 283 and Rule 65(a) of Federal Rules of Civil Procedure on March 3, 2010, [DE-49]. Defendant subsequently responded to the Motion for Summary Judgment on February 3, 2010, [DE-46], and the Motion for Preliminary Injunction on March 24, 2010, [DE-54]. On February 19, 2010, Plaintiff filed an additional Reply Brief in Support of Plaintiff's Motion for Summary Judgment

---

[1] Defendant contends the first commercial offer for sale of the device was on May 31, 2005, while Plaintiff asserts the OzCAT was not offered for commercial sale until July 12, 2005.

of Infringement, [DE-47]. On April 9, 2010, Plaintiff filed an additional Reply Brief in Support of Plaintiff's Motion for Preliminary Injunction. [DE-58].

Trial was originally set for July 6, 2010. [DE-62]. However, because resolution of the two pending motions would likely simplify the issues at trial, Defendant moved for and was granted a continuance; trial is currently set for October 4, 2010. [DE-64, 68]. In this posture, Plaintiff's Motion for Preliminary Injunction is ripe for ruling.

## DISCUSSION

### A. Standard of Review

A preliminary injunction is an extraordinary remedy afforded prior to trial and largely at the discretion of the district court. *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

The Supreme Court's recent opinion in *Winter v. Natural Resources Defense Council, Inc.*, articulated exactly what must be demonstrated by a party seeking a preliminary injunction: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." 129 S.Ct. 365, 374 (2008). As any party seeking an injunction must do, a *patentee* seeking a preliminary injunction against an *alleged infringer* must demonstrate each and every one of these factors laid out in *Winter*. *Titan Tire Corp. v. Case New Holland Inc.*, 566 F.3d 1371, 1375 (Fed. Cir. 2009) (emphases added).

### B. Application

#### 1. Likelihood of Success

The first factor that must be considered in granting a preliminary injunction is whether the party seeking the injunction has established a likelihood of success on the merits at trial. In a patent case, there are two prongs to this analysis: (1) Has the patent been infringed?; and (2) Will the patent withstand any challenges to its validity? *Titan Tire*, 566 F.3d at 1376 (citing *Genentech*, 108 F.3d at 1364 (A "patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." )).

At this stage of the case, the district court assesses the merits of an action "in light of the burdens and presumptions that will adhere at trial." *Titan Tire*, 566 F.3d at 1376; *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). In other words, the court will take into account and accordingly assess the likelihood of success of an action, not based on any present pre-trial burden (such as the pre-trial showings a Federal Rules of Civil Procedure 56 or 12(b)(6) motion would demand), but based on the particularized presumptions, burdens of production, and burdens of persuasion that would be present at trial.

a. Infringement

In evaluating the likely merits of patentee's action pre-trial, the first consideration is whether or not the patentee is likely to prove infringement at trial. At trial, the Plaintiff would have to demonstrate by a preponderance of the evidence the alleged infringement; that same burden tracks here in the pre-trial injunction analysis. For the following reasons, the evidence on record satisfies this court, that, more likely not, Plaintiff would be able to demonstrate infringement at trial.

On January 13, 2010, Morris filed with the court the current pending Motion for Summary Judgment of Infringement for claims 1, 2, 5-10, 12 and 17 of its '173 patent. [DE- 42]. Defendant subsequently filed its response, in which it was stated that:

> Defendant has contended, and continues to contend, that U.S. Patent No. 7,740, 173, including Claims 1, 2, 5-10, 12 & 17, is invalid, void and unenforceable. However, <u>if these claims are found to be valid and enforceable</u>, Defendant would <u>stipulate to the entry of summary judgment of infringement</u> . . . under the facts of the KillCAT application at Perdue Farms, Milford, DE.

Def.'s Resp. at 2 [DE-46] (emphases added). Faced with this stipulation, the court is compelled to find that, for purposes of preliminary injunction, if the '173 patent is valid Plaintiff could likely prove that Defendant's KillCAT device infringes at least claims 1, 2, 5-10, 12 & 17 of Plaintiff's '173 patent with regards to at least one application in Milford, Delaware. Furthermore, with regards to other instances of infringement, the court weighs heavily the evidence indicating that CAT has no other non-infringing uses for its KillCAT application. The testimony of CAT's CEO Mike Miller, discussing applications of KillCAT beyond chemical treatment of poultry, is particularly telling for the court:

> Q: You may have answered this too. What other uses do the KILLCAT chillers have that you may offer them for?
> A: If somebody wants a real small chiller, you could use a KILLCAT, same thing.
> Q: How many installations have you sold for that purpose.
> A: None. None whatsoever. It's too small.

Pl.'s Mem., Ex. O [DE-43]. The Defendant has left little room on the record to contest infringement in fact and has hedged its defense primarily on assertions of invalidity. The record evidences that continued sales of the KillCAT application are more likely than not further infringement of the '173 patent that could be demonstrated at trial. Additionally, as CEO Mike Miller's testimony shows, there has not been another KillCAT sale for purposes beyond

6

Case 5:09-cv-00023-BR   Document 69   Filed 07/30/10   Page 6 of 19

concentrated chemical treatment of poultry. Based on the foregoing and the courts conclusion on validity below, the court is satisfied that Plaintiff has shown that, more likely than not, they will be able to demonstrate infringement at trial.

b. Validity of the '173 Patent

Aside from demonstrating likely infringement, a patentee seeking a preliminary injunction must show that he can, more likely than not, withstand any challenges to the validity of his patent at trial. *Genentech*, 108 F.3d at 1364.

First and foremost, a patent issued in the United States is presumed valid. 35 U.S.C. § 282; *Titan Tire*, 566 F.3d at 1376; *Canon Computer Sys., Inc. v. Ku-Note, Int'l, Inc.*, 134 F.3d 1085, 1088. At trial, "an alleged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by *clear and convincing evidence*, as well as the initial burden of going forward with evidence to support its invalidity allegation." *Titan Tire*, 566 F.3d at 1375-76 (emphasis added). Clear and convincing means that the evidence presented "could place in the ultimate fact finder an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, (1984).

Again, when analyzing a preliminary injunction motion in a patent case, the burdens and presumptions at pre-trial track those that would adhere to the parties at trial. Thus, if an "alleged infringer responds to the preliminary injunction motion by launching an attack on the validity of the patent, the burden is on the *challenger* to come forward with evidence of invalidity, just as it would in trial." *Titan Tire*, 566 F.3d at 1375-76; *see also Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). Even more specific to this case, when analyzing a preliminary injunction, the court "must determine whether it is more likely than not

that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is invalid." *Titan Tire*, 566 F.3d at 1379.

Defendant CAT is challenging the validity of the '173 patent. The burden pre-trial is thus on CAT to show that, more likely than not, they will be able to demonstrate by clear and convincing evidence *at trial* the invalidity of the '173 patent. For the following reasons, the court finds the Defendant has not met this burden.

1. "On-Sale" Bar Claim of Invalidity

CAT claims its OzCAT invention (the predecessor to aforementioned KillCAT application) triggered 35 U.S.C. § 102(b)'s "on-sale" bar and thus renders Morris' '173 Patent invalid.

United States Patent Law in 35 U.S.C. § 102(b) provides that "[a] person is entitled to a patent unless— . . . the invention was . . . on sale in this country, more than one year prior to the date of application for patent in the United States." The "on-sale" bar § 102(b) was further elaborated in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 56 (1998). In *Pfaff*, the court held that the "on-sale" bar applies to a patent when prior to the critical date (1) the invention for which a patent is sought has been the subject of a commercial offer for sale and (2) the invention was ready for patenting. *Id.* For the second prong of this test, *Pfaff* further explained that "ready for patenting" could be proven by showing either reduction of the invention to practice or proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention. *Id.*

Before discussing the two *Pfaff* prongs, the court notes that the "critical date" for the purposes of § 102(b) is the date one year prior to the date of application for patent. *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009). The court is satisfied,

8

and it is uncontroverted on this motion, that the "critical date" for the '173 patent is June 13, 2005—one year prior to Plaintiff's provisional patent application.

## A. Commercial Offer for Sale Prong of Pfaff

The first prong of the *Pfaff* on-sale bar test is whether or not the invention was subject to a commercial offer for sale prior to the critical date. To establish a commercial offer for sale, one "must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell more than one year before the application for the subject patent." *STX, LLC v. Brine, Inc.*, 211 F.3d 588, 590 (Fed. Cir. 2000). "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance, constitutes an offer for sale under §102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001).

In assessing a § 102(b) invalidity claim, a court must determine whether or not something is a commercial offer for sale under the law of contracts as generally understood. *Id.* at 1047. At its most basic conception, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). "What constitutes an offer will depend on facts of each case." *Partsriver, Inc. v. Shopzilla, Inc.*, No. C09-811 CW, 2009 WL 2591355, at *4 (N.D. Cal. 2009).

Defendant contends that its alleged sale or offer to sell its ozone generator and "OzCAT" tank on May 31, 2005 constitutes an invalidating "on-sale" bar to the '173 patent under § 102(b). Def.'s Resp. Considering the circumstances surrounding May 31, 2005, the court is not convinced that there existed a §102(b) "commercial offer for sale" prior to the critical date.

Defendant submits as evidence of a commercial offer for sale a document dated May 31, 2005 and titled "BUDGET." Def.'s Resp., Ex. C4 [DE-54]. The document references an "OzCAT Tank" but provides little description of the device and associated system of treating poultry. *Id.* There is no a stated method for delivery on the document. The price listed on the document is titled as a "Budgetary Price." *Id.* The document itself is not more than one-page in length and provides no illustrations or pictures of the OzCAT device.

In-and-of itself, the document seems more to support Plaintiff's contention that all CAT presented to Tyson Foods on May 31, 2005 was a mere "budgetary proposal" or budgetary quotation. This would be a significant distinction as, evaluating the existence of an offer under the common law of contracts, price quotations are generally not considered offers. Restatement (Second) of Contracts § 26 cmt. c (1981). Documents such as budgetary quotations do not rise to the level of specificity found in a commercial offer for sale. Proposals and quotations are assumed to leave the door open for further rounds of assent. For these reasons, in a similar case, *MLMC, LTD v. Airtouch Communications, Inc.*, 215 F. Supp. 2d 464 (D. Del. 2002), the court held that a budgetary price quotation was not a commercial offer for sale for purposes of the § 102(b) on-sale bar.

However, the ultimate test of whether there has been an offer is to look at whether the recipient should have reasonably believed the communication to be a binding offer. *Id.* at 480; Restatement (Second) of Contracts § 24. Accordingly, the court looks to the circumstances surrounding a communication to consider whether or not a commercial offer for sale exists. Restatement (Second) of Contracts § 24; *Partsriver*, 2009 WL 2591355, at *4. In our analysis, this means we look beyond the May 31, 2005 document itself and to the surrounding testimony and evidence on the record.

10
Case 5:09-cv-00023-BR   Document 69   Filed 07/30/10   Page 10 of 19

The surrounding circumstances do not support Defendant's contention that the May 31, 2005 document was a commercial offer for sale.

First, the statements of Tyson and CAT executives suggest CAT had not issued a commercial offer for sale on that date but some less binding application. Generally, the statements of these executives seem to support Plaintiff's contention that the May 31, 2005 meeting and document were just preliminary quotations and negotiations. To begin with, Tyson Food's Chris Graves stated: "[T]he May 31st meeting was to give me a price so that for budgetary purposes, we could decide whether or not we were going to purchase or continue down that road. . . ." Pl.'s Mem., Ex. D. The courts sees this as evidence that CAT's purpose on May 31, 2005, was not to *seek final acceptance*, as a subjective offer would, but provide a price quote for Tyson Food's budgeting process.

Furthermore, CAT's Mike Miller, discussing the May 31, 2005 document at issue (labeled internally CAT090) during his deposition, testified:

> Q: Would you go ahead and identify what CAT090 appears to be?
> A: It's basically a proposal to them to allow them to ask for money because they can't send in to they [sic] budget request without something to show what they're asking the money for.

Pl.'s Resp., Ex. G. Like in *MLMC, LTD*, where the purpose of the quotations was not to obtain a final acceptance but instead for a licensing purpose, the objective of these quotations, by CAT's own testimony, was not to receive Tyson's final acceptance, it was to allow Tyson Foods to "ask for money" or see if this was the type and scope of project Tyson Foods could pursue. The court is not convinced that either CAT or Tyson Foods subjectively would have considered May 31, 2005, to be the final manifestation of an offer which could be made binding with simple acceptance.

11

Additionally, although not dispositive by any means, the July 12, 2005 proposal by CAT to Tysons gives further weight to Plaintiff's position. Plaintiff's Exhibit H, Defendant's July 12, 2005 Proposal and Project Drawings, lays out an OzCAT proposal with a much greater degree of specificity than the May 31, 2005 document. Pl.'s Mem., Ex. H. Installation terms are described on this document. The price is listed as a "Proposal Price" in contrast to the "Budgetary Price" label affixed in the May 31, 2005 document. *Id.* There is a proposal number ("Proposal # 29720") at the top of the document—a number absent from the May 31, 2005 document. *Id.* There are supplemental diagrams of the OzCAT device attached to the proposal. *Id.*

More importantly, the format of the July 12, 2005 document is much more consistent with commercial for offers for sale of Defendant's later KillCAT system. Pl.'s Mem., Exs. I-1 & I-2. Considering the practices and procedures of CAT in our inquiry into whether there has been a commercial offer for sale, the July 12, 2005 document and other sales documents substantially call into question whether or not the May 31, 2005 document was clearly such an offer.

Finally, the court notes that this July 12, 2005 document was not disclosed by the Defendant in initial discovery, but only uncovered after Plaintiff's subpoena on Tyson's. Pl.'s Mem. at 14. The court is troubled that the Defendant had in its possession a detailed proposal for the OzCAT system, central to this case, and yet did not disclose this document in the normal course of discovery.

Taking the whole of the evidence submitted under consideration, the court is not satisfied that the Defendant has carried its burden to show it is more likely than not that it could prove at trial the invalidity of Plaintiff's '173 Patent by *clear and convincing evidence.*

### B. Ready for Patenting

Even if Defendants could demonstrate that they made a commercial offer for sale prior to the June 13, 2005 critical date, the court concludes that it is not clear that Defendant would be able to meet its burden under the second prong of the *Pfaff* test—"ready for patenting." To meet the second prong of the *Pfaff* test, the Defendant must show either reduction of the invention to practice or proof that the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention prior to the critical date. *Pfaff*, 525 U.S. at 67-68.

Nothing in the records evidences that the allegedly infringing application of the OzCAT (now KillCAT) device was reduced to practice prior to this date. The record indicates that the first OzCAT machine was not even installed until September 2005. Furthermore, there is a substantial issue as to whether or the OzCAT system functioned for its intended purpose. Therefore, the court turns to whether or not there were drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention prior to the critical date prior to May 31, 2005.

Defendant claims that a March 22, 2005 meeting between CAT and Tyson Foods "defined the invention of the OzCAT" and that at the end of this meeting there was a "fully enabled description of an 'invention' that was 'ready for patenting.'" Def.'s Resp. Thus, Defendant claims, the second prong of the *Pfaff* test is satisfied.

However, the record evidences that what transpired on March 22, 2005 was a 30 minute meeting between CAT and two Tyson Food's representatives. Pl.'s Reply. Mem., Ex. O [DE-58]. Tyson's Michael Freer, an attendant of the March 22, 2005 meeting, testified that there "were more questions than anything of the discussion. . . . " *Id.* The record does not show, and Defendant does not contend, that any drawings or descriptions of the OzCAT device were

created at this meeting. Yet, Defendant argues that a fully enabled description of this complex machine resulted from this brief meeting.

Although not dispositive, the record raises substantial questions about whether the OzCAT device initially worked for its intended purpose. The record shows that the initial test of the OzCAT system resulted in only a 2% reduction in bacteria (10/57 chickens contaminated before OzCAT treatment, 9/57 contaminated after). Def.'s Resp., Ex. O [DE-54]. Defendant continually had to adjust the system until it was ultimately abandoned. Def.'s Resp. The fact that the application wasn't functioning adequately does not add much to the argument that the invention was "fully conceived" on March 22, 2005, and thus does not help Defendant meet its burden.

The Defendant points to CAT's Claims Chart as evidence that "each claim asserted by Morris was anticipated by the OzCAT invention at least as early as the conclusion of the March, 22, 2005 meeting and well before the Critical Date of June 13, 2005." Def.'s Resp. at 10. Although the claims chart fairly meticulously goes through each claim and compares it to later diagrams and descriptions of the OzCAT device, it fails to establish how any of these very specific details were conceived on March 22, 2005. Def.'s Resp., Ex. K.

As discussed above, when an "alleged infringer responds to [a] preliminary injunction motion by launching an attack on the validity of the patent, the burden is on the *challenger* to come forward with evidence of invalidity, just as it would in trial." *Titan Tire*, 566 F.3d at 1375-76. As with the first prong of the *Pfaff* test, the burden fell on the Defendant to show it was more likely than not it could prove by clear and convincing evidence at trial that its invention, anticipating the '173 patent's claims, was ready for patenting prior to the critical date. Based on the incomplete record before the court, the Defendant could not meet this burden.

14

Having demonstrated the likely infringement of its '173 patent and that it can likely withstand any challenges to the patent's validity, Plaintiff accordingly satisfies the first *Winter* factor for preliminary injunction—likelihood of success on the merits.

### 2. Irreparable Harm

In seeking a preliminary injunction, a patentee must demonstrate that, should a preliminary injunction not be issued, there is a "likelihood" that the patentee will incur irreparable harm. *Winter*, 129 S.Ct. at 374-76. For purposes of injunctive relief, irreparable harm means that the plaintiff is unlikely to be made whole by just the award of monetary damages in law and is better served by the equitable remedy of injunction. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 318 (2d Cir. 1995).

Both parties, in their respective memorandums before the court, have devoted much time to whether or not a patentee seeking a preliminary injunction is entitled to a presumption of irreparable harm should validity and infringement be clearly established.[2] While acknowledging these arguments, this court does not reach this issue of presumption. The court concludes that, absent of any presumption, Plaintiff has sufficiently demonstrated irreparable harm.

First, the record is uncontroverted that Plaintiff and Defendant are the sole competitors in a tight, two-competitor marketplace for this specialized poultry chilling/disinfecting equipment.

---

[2] The court notes that this is an issue largely unresolved among the courts. Generally, in patent jurisprudence, the courts have found that "[w]here validity and continuing infringement have been clearly established...immediate irreparable harm is presumed." *Smith Int'l Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983); *Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*, 429 F.3d 1364 (Fed. Cir. 2005). However, since the U.S. Supreme Court's recent decision in *eBay Inc. v. MercExchange*, 547 U.S. 388 (2006), several district courts have concluded that a patentee is no longer entitled to this protection. *z4 Techs, Inc. v. Microsoft Corp.*, 434 F. Supp.2d 437, 440 (E.D. Tex. 2006); *Torspo Hockey Int'l Inc. v. Kor Hockey Ltd.*, 491 F.Supp.2d 871, 881 (D. Minn. 2007); *Chamberlain Group Inc. v. Lear Corp.*, 83 USPQ2D 1843, 1848 (N.D. Ill. 2007), *vacated on other grounds*, 516 F.3d 1331, 86 USPQ2d 1104 (Fed. Cir. 2008). Yet still, in light of the Federal Circuit's recent the decision in *Broadcom Corp. v. Qualcomm Inc.*, it is unclear whether *eBay Inc.* did in fact do away with a patentee's rebuttable presumption of irreparable harm and is largely an unresolved issue. No. 2008-1199 (Fed. Cir. 09/24/2008) (stating that the issue of presumed irreparable harm is still "an open question.")

15

Case 5:09-cv-00023-BR   Document 69   Filed 07/30/10   Page 15 of 19

While not dispositive on the issue of irreparable harm, the court is convinced that a loss of any market share, by virtue of there being only two competitors and few customers, would at least be substantial harm to a party.

Furthermore, the court takes note of the unique nature of the equipment at issue in this case when assessing irreparable harm. Unlike fungible goods, the record evidences that Plaintiff and Defendant's poultry equipment is large, custom, expensive, and designed to last a significant lifetime of production. The record evidences that once a poultry factory purchases one of these systems, it is unlikely they will reenter the market place for a significant number of years. Thus, each sale of equipment is the likely formation of a long-lasting business relationship. Defendant concedes these stakes in its Response and Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, arguing that when it loses a sale of its KillCAT device to Plaintiff, it is losing a customer relationship that "might never be repaired." Def.'s Resp., at 20 [DE-54]. In other words, once Plaintiff or Defendant loses a sale, it is unlikely they will be able to (a) sell to that customer their pathogen reduction chilling system any time soon or (b) easily find another buyer. As in *Polymer Technologies, Inc. v. Bridwell*, these types of market or customer relation losses can constitute "irreparable damage" for purposes of preliminary injunction if they reach a certain level of substantiality. 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages. . . .") The court concludes that the losses at stake here rise to the level of irreparable harm.

Lastly, the record evidences not only that harm would be irreparable, but that there is a *likelihood* of harm. There is no evidence that Defendant intends to stop marketing and selling its KillCAT device presently. The court is satisfied, as evidenced by sales records of the KillCAT

device, Def.'s Resp. Exs. I-1 & I-2, that for the interim between now and trial there is a likelihood the irreparable harm discussed above will manifest without the issuance of an injunction.

Based on the forgoing, the court is satisfied that Plaintiff has demonstrated that, absent an injunction, Plaintiff is likely to incur harm that for which it is impossible to compensate with just the award of damages. Accordingly, there is a likelihood of irreparable harm absent a preliminary injunction and the second *Winter* factor is thus satisfied.

### 3. Balance of the Equities

In analyzing the third *Winter* factor, "[t]he district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech Inc. v. Abott Laboratories*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). For the following reasons, the court concludes that the equities tip in Plaintiff's favor.

As discussed *supra*, both Plaintiff and Defendant face losses that might be irreparable. Both stand to lose customer relationships for a substantial period of time that might never be repaired. The Defendant has presented no special consideration outside of this harm for which the equities should tip in its favor. If anything, what remains uncontroverted on the record is Defendant's ready ability to sustain its business operations through the sale of its other products and services not alleged to be infringing on Plaintiff's patent if an injunction were to issue. Pl.'s Mem. at 25-26. In a similar case, *Rosen Entm't Sys, LP v. Icon Enters., Inc.*, 359 F. Supp. 2d 902, 911 (C.D. Cal. 2005), the district court held that a non-moving party's ability to sustain its business absent the sale of the allegedly infringing product was a relevant factor in weighing

relative equities for purposes of preliminary injunction. Likewise, the court gives weight to Defendant's such ability now.

Furthermore, the court finds relevant the Plaintiff's likelihood of success when balancing the equities. The most important protection of a patent is the right to exclude. *Smith International, Inc.*, 718 F.2d at 1573. Plaintiff has demonstrated a likelihood of infringement and validity. In light of this demonstration, the court concludes that taking away the right to exclude from Plaintiff in this circumstance would be inequitable and tips the balance of the equities in Plaintiff's favor.

Based on the forgoing, Plaintiff satisfies the third *Winter* factor for preliminary injunctive relief.

### 4. Public Interest

"[T]he public interest is best served by enforcing patents that are likely valid and infringed." *Abbott Labs. V. Andrx Parms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006); *see also Smith Int'l*, 718 F.2d at 1581. Thus, in evaluating the fourth *Winter* factor for issuing a preliminary injunction, "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech, Inc.*, 849 F.2d at 1458 (*citing Datascope Corp. v. Kontron Inc.*, 786 F.2d 398, 401 (Fed. Cir. 1986)); *see also PPG Indus. Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996).

Defendant has alleged (a) a public interest in not "enforcing a monopoly under an invalid patent" and (b) fostering competition in the marketplace. As discussed *supra*, the court concludes Plaintiff has a likelihood of success on the merits, thus rendering moot Defendant's first public interest argument. Second, the court rejects the argument that enforcing a likely valid

patent would be detrimental to the marketplace. By affording a patentee the enforcement of a preliminary injunction when it has demonstrated likely validity and infringement, the court is "further[ing] [the] public policy inherent in the patent laws designed to encourage useful inventions by rewarding the inventor with a period of market exclusivity." *Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005).

Accordingly, the court concludes that Plaintiff satisfies the "public interest" *Winter* factor for preliminary injunction.

## CONCLUSION

Based on the forgoing, the court finds Plaintiff has satisfied each factor for preliminary injunctive relief as set out by *Winter v. Natural Resources Defense Council, Inc.* and RECOMMENDS that Plaintiff's Motion for Preliminary Injunction be GRANTED against Defendant as follows:

Defendant shall be enjoined from making, using, selling, offering to sell, and/or importing its KillCAT pathogen reduction system and product, effective only upon Plaintiff's posting of appropriate security in the amount of $75,000.00 with the Clerk of Court.

The clerk shall send copies of this Memorandum and Recommendation to the parties who have fourteen days (14) after receiving it to file written objections. Failure to file timely written objections bars or may bar an aggrieved party from receiving a *de novo* review by the District Court on an issue covered in the Report, and, except on grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

This 30th of July 2010.

David W. Daniel
United States Magistrate Judge