IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CV-23-BR

| | |
|---|---|
| MORRIS & ASSOCIATES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| COOLING & APPLIED ) | |
| TECHNOLOGY, INC., ) | |
| ) | |
| Defendant. ) | |

This matter comes now before the undersigned for Memorandum and Recommendation on Plaintiff's Motion for Summary Judgment of Infringement of Claims 1, 2, 5-10, 12 & 17 of U.S. Patent No. 7,470,173 [DE-42]. For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Summary Judgment of Infringement be GRANTED.

## STATEMENT OF THE CASE

Plaintiff, Morris & Associates ("Morris"), is a North Carolina corporation involved in the manufacture of industrial refrigeration equipment for both domestic and worldwide markets. Defendant, Cooling and Applied Technologies ("CAT"), is an Arkansas corporation also involved in the manufacture and sale of refrigeration equipment.

This dispute involves Defendant's alleged infringement of Plaintiff's U.S. Patent No. 7,470,173 ("the '173 patent"), which is entitled "Post Chill Decontamination Tank." The '173 patent was filed on June 13, 2007 subsequent to a Provisional Application for the patent which had been filed on June 13, 2006 (also entitled "Post Chill Decontamination Tank").

The record demonstrates that a problem in poultry processing concerns bacterial contamination. The "evisceration" process of poultry leaves bird carcasses particularly vulnerable to salmonella, herpes, and e. coli contaminations. Because bacteria grows much more rapidly at warmer temperatures than colder ones, poultry processors are required to lower the temperature of eviscerated birds from a live body temperature of 90-100° F to less than 40° F shortly after slaughter. Pl.'s Memo., Ex. A [DE-43]. In the poultry industry, a large device known as a "chiller" is used to accomplish this lowering of body temperatures. *Id.* Chillers are large chambers that pass recently eviscerated birds through cool water until the birds' body temperatures drop below 40° F. *Id.* However, chillers do not always adequately reduce bacteria to regulation levels. Pl.'s Memo., Ex. E.

Plaintiff thus claims it developed the "Post Chill Decontamination Tank" for the purpose of "treat[ing] and reduc[ing] the microbial contamination on the surfaces of the birds after the birds are removed from the chiller." Pl.'s Memo., Ex. A. The Post Chill Decontamination Tank is a smaller chamber that attaches to the end of an aforementioned chiller tank. *Id.* Once the poultry passes through the larger chiller tank, the chilled poultry exits into Plaintiff's Post Chill Decontamination Tank. *Id.* In this tank, the poultry is submerged and pushed by paddles through a concentration of chemicals that rapidly reduce the bacteria levels of the poultry. *Id.* According to Plaintiff, this results in a cheap, quick, and effective way to reduce the levels of bacteria on freshly slaughtered poultry to regulation levels. *Id.*

Defendant manufactures and sells a competing device known as the "KillCAT." Pl.'s Memo., Ex. F. KillCAT is described as a pathogen reduction system made and designed "to meet and exceed the stringent food safety regulations that are in place today." *Id.* Essentially, the KillCAT system is a 5' tank that sits at the end of a larger chiller tank. *Id.* Birds exit the

chiller tank and enter the KillCAT before being pushed through a liquid solution by rotating paddles. *Id.* The KillCAT is designed with two chemical introduction ports. *Id.* The chemical ports are for the rapid introduction of chemical solutions into the KillCAT device. Pl.'s Memo., Ex. E. The KillCAT also comes with chemical monitoring equipment, which maintains the pH or acidic levels of chemical solution in the KillCAT device. Pl.'s Memo., Ex. E&F.

Plaintiff filed its complaint in this action on January 22, 2009, alleging one claim of infringement arising under the patent laws of the United States, Title 35, United States Code and its '173 patent. Pl.'s Compl. [DE-1]. Specifically, Plaintiff alleges that Defendant's use, sale, import, and offer of the KillCAT system constitutes direct infringement, contributory infringement, and/or inducement to infringe one or more claims of Plaintiff's '173 patent in violation of 35 U.S.C. § 271. *Id.* Plaintiff filed a Motion for Summary Judgment on January 13, 2010, [DE-42], and a Motion for Preliminary Injunction pursuant to 35 U.S.C. § 283 and Rule 65(a) of the Federal Rules of Civil Procedure on March 3, 2010 [DE-49]. Defendant subsequently responded to the Motion for Summary Judgment on February 3, 2010 [DE-46], and the Motion for Preliminary Injunction on March 24, 2010. [DE-54]. On February 19, 2010, Plaintiff filed an additional Reply Brief in Support of its Motion for Summary Judgment of Infringement. [DE-47]. On July 30, 2010, the undersigned recommended that Plaintiff's Motion for Preliminary Injunction be granted [DE-69].

Trial was originally set for July 6, 2010. [DE-62]. However, because resolution of the two pending motions would likely simplify the issues at trial, Defendant moved for and was granted a continuance; trial is currently set for October 4, 2010. [DE-64, 68]. In this posture, Plaintiff's Motion for Summary Judgment of Infringement of Claims 1, 2, 5-10, 12, & 17 is ripe for ruling.

3

## DISCUSSION

### A. Standard of Review

Plaintiff has moved for Summary Judgment of Infringement of Claims 1, 2, 5-10, 12 & 17 of the '173 patent. [DE-46]. Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment on the specific issue of infringement or non-infringement is available in patent litigation and is just as appropriate as any other motion for summary judgment. *See, e.g., Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351 (Fed. Cir. 2006); *Semitool, Inc. v. Dynamic Micro Sys. Semiconductor Equip. GmbH*, 444 F.3d 1337, 1447 (Fed. Cir. 2007); *Microstrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1353 (Fed. Cir. 2005).

Pursuant to Rule 56(e)(2) of the Federal Rules of Civil Procedure, a motion for summary judgment may be supported with affidavits and other documentation that would be admissible in evidence. Fed. R. Civ. P. 56(e)(2). Rule 56(e)(2) further provides that when a motion for summary judgment is properly made and accompanied by supporting affidavits, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." *Id.* "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Id.*

However, particularly for purposes of this motion, it is important to note that Rule 56(e)(2) does not necessarily *require* a non-moving party to present affidavits or other evidence to defeat a summary judgment motion. *See Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006). "If, for example, the movant bears the burden and its motion fails to satisfy that burden, the non-movant is 'not required to come forward' with opposing

4
Case 5:09-cv-00023-BR   Document 78   Filed 08/20/10   Page 4 of 19

evidence." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). This is consistent with the text of Rule 56(e)(2), which states that if the non-moving party does not respond, summary judgment shall issue "if appropriate...." Fed. R. Civ. P. 56(e)(2).

## B. Application

### 1. Facts In Dispute

The Court first addresses the issue of which facts are in contention and applicable to this motion. In support of its motion, Plaintiff set forth numerous facts that it contends are not in dispute and presented various exhibits, including deposition testimony and CAT documents related to the promotion and sale of KillCAT. Pl.'s Memo. at 6-10, Ex. A-R [DE-43]. In response, Defendant stated as follows:

> For purposes of this motion, the facts regarding the KillCAT application at Perdue Farms, Milford DE as alleged by the Plaintiff are not in dispute. All other facts remain in dispute, but do not pertain to the issues raised by Plaintiff's motion.

Def.'s Resp. at 2 [DE-46].

Pursuant to Rule 56(e)(2) and Local Civil Rule 56.1, "when a motion for summary judgment is properly made and supported" the non-moving party "may not rely merely on allegations or denials" in its pleadings but must by "affidavits . . . set out specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Defendant has presented no evidence, by affidavit or otherwise, to contest the material facts alleged by Plaintiff. Accordingly, the Court accepts the facts as stated by Plaintiff and finds that there are no material facts in dispute that would preclude summary judgment. Nevertheless, the Court must still determine whether Plaintiff is entitled to judgment as a matter of law.

### 2. Patent Validity and Stipulation to Entry of Summary Judgment

It appears to the Court that Defendant disputes the validity of the '173 patent, but that if the patent is found to be valid then Defendant would concede infringement. In its response to Plaintiff's Motion for Summary Judgment of Infringement, Defendant stated in pertinent part:

> Defendant has contended, and continues to contend, that U.S. Patent No. 7,740,173, including Claims 1, 2, 5-10, 12 & 17, is invalid, void and unenforceable. However, if these claims are found to be valid and enforceable, Defendant would stipulate to the entry of summary judgment of infringement under 35 U.S.C. §271(b) and (c) with regard to Claims 1, 2, 5-10, 12 & 17 of U.S. Patent No. 7,740,173, under the facts of the KillCAT application at Perdue Farms, Milford, DE.

Def.'s Resp. at 2. This was the sole argument presented in Defendant's response.

To be clear, patent infringement and patent validity are two distinct legal issues and are treated accordingly. *See Pandrol USA, LP v. Airboss Rwy. Prod., Inc.*, 320 F.3d 1354, 1364 (Fed. Cir. 2003); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563 (Fed. Cir. 1983). Just as a patentee or alleged patent infringer can move for summary judgment on the issue of infringement, a patentee or alleged infringer may move for summary judgment on the issue of validity. *See, e.g., IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1378 (Fed. Cir. 2005) (affirming grant of summary judgment of invalidity); *Teleflex, Inc. v. Ficosa C. Am. Corp.*, 299 F.3d 1313, 1329-30 (Fed. Cir. 2002) (affirming grant of partial summary judgment of no invalidity). "[W]hether [a claim] is infringed is an entirely separate question capable of determination without regard to its validity." *Medtronic, Inc.*, 721 F.2d at 1583. Defendant has not moved for summary judgment on the issue of validity, and Defendant's allegation of invalidity has no substantive effect on the determination of whether Plaintiff is entitled to judgment as a matter of law on infringement. Accordingly, the Court may rule on the issue of infringement without addressing the issue of validity, which is not presently before the Court.

**3. Merits of Indirect Infringement Claims Under 35 U.S.C. §271**

The Court's analysis does not end with Defendant's failure to raise a substantive response to the issue of infringement. Plaintiff, despite the uncontroverted facts before the Court, must still demonstrate that it is entitled to summary judgment as a matter of law on the issue of infringement to prevail on its motion. "[W]here the moving party has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense." *Meyers v. Brooks Shoe.*, 912 F.2d 1459, 1461 (Fed. Cir. 1990), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992).

Plaintiff claims that, because Defendant is a manufacturer and distributor of the allegedly infringing equipment as opposed to an operator, Defendant is liable as an infringer under two forms of indirect infringement—liability as a contributory infringer and liability for inducement to infringe under 35 U.S.C §§ 271(a) and (b) respectively. Pl.'s Memo. at 16 & 23. However, of first importance is the fact that inherent in both these forms of indirect infringement is the existence of a direct infringer. *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004); *see also Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1334 (Fed. Cir. 2003). Thus, the Court must determine if there has been an instance of direct infringement with regards to at least one of Defendant's customers, and such a finding predicates further discussion on any claims of inducement to infringe and contributory infringement.

### a. Direct Infringement by Defendant's Customers

In order for Defendant to be liable for contributory infringement or inducement to infringe under 35 U.S.C. §§ 271(c) and 271(b), the Court must first determine whether there has been a predicate act of direct infringement by one of Defendant's customers. *BMC Resources,*

*Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007). Judgment on direct infringement requires a two-step analysis: First, the court construes the patent's claims as a matter of law to determine their scope and meaning. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372-74 (1996). Second, the court determines whether the allegedly infringing product contains each element of the construed claims of the patent at issue. *Id.*; *see also Dynacore*, 363 F.3d at 1273 (Fed. Cir. 2004).

For the purpose of this motion, the first step, construction, is not necessary. The only claims pending claim construction are 3 & 20 of the '173 patent. Joint Claim Const. Stmt. [DE-32]. Plaintiff has moved for Summary Judgment of Infringement on only Claims 1, 2, 5-10, 12, & 17. With none of these claims requiring construction, the Court moves to the second step, the issue of whether or not Plaintiff's KillCAT product contains each element of the claims before the Court.

Defendant has admitted that its KillCAT product contains every element of claims 1, 2, 5-10, 12, & 17 except for one—the "non-admitted element."[1] Pl.'s Memo., Ex. H [DE-43]. The non-admitted element, pertaining to the solution to be used in the '173 patent's post chill decontamination tank, is described in Claim 1 of the '173 patent as follows:

> "...said decontamination solution having a <u>different composition than the liquid solution in the chiller</u> such that the decontamination solution in said chamber has more rapid antimicrobial effect than the liquid solution in said chiller for further reducing the microbial contamination on the surfaces of poultry carcasses."

---

[1] The Court notes that Defendant, having not set out—by affidavit, exhibit, or otherwise—specific facts showing a genuine dispute over the existence of the "non-admitted element," may have indeed conceded the point for purposes of this motion. However, this court, viewing all evidence and factual contentions in a light most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), takes notice that at minimum Defendant's assertion of the non-admitted element is on the record before the Court as Pl.'s Exhibit H to its Memorandum in Support of Summary Judgment. (Defendant's Amended Preliminary Non-Infringement and Invalidity Contentions, Ex. A). As such, holding all evidence and factual contentions in a light most favorable to Defendant, this court discusses the merits of this non-admitted element in the absence of any wholesale concession to its existence.

8
Case 5:09-cv-00023-BR   Document 78   Filed 08/20/10   Page 8 of 19

Pl.'s Memo., Ex. A (emphasis added). No claim construction is required on this element because the parties do not dispute its meaning. The parties agree that the non-admitted element necessitates a decontamination solution in the post chill decontamination tank having a different composition than that of the liquid contained in the preceding chiller. The parties agree that, specifically, "different composition" means "not in the same nature of ingredients or things that are held or included in something." Joint Claim Const. Stmt. [DE-32]. CAT maintains that KillCAT *does not* necessitate using a different content/composition than that which is used in the main chiller.[2] Pl.'s Memo., Ex. H. Defendant claims that, though it personally installs the KillCAT, it is purely the customer's prerogative as to what solutions are actually used in the KillCAT and chiller, and that therefore, customers could perhaps use identical solutions in both their KillCAT and chiller. However, Defendant has admitted that at least some of its customers do in fact operate KillCAT in a manner consistent with the non-admitted element:

> To the best of CAT's knowledge and belief, at least some of CAT's customers operate or have operated the KillCAT following a chiller where the KillCAT has a decontamination solution that is not the same in the nature of ingredients or things as the liquid solution in the chiller.

*Id.* The record evidences that one of these such customers is Perdue Farms in Milford, Delaware. The uncontroverted testimony of Perdue executive Dean Walston, Pl.'s Memo., Ex. D, and Defendant's explicit concession to Plaintiff's facts as to the KillCAT installation at Milford, Delaware, Def.'s Resp., leave no doubt that Perdue Farms in Milford, Delaware, is both a customer of Defendant and has been using KillCAT with a decontamination solution that has a completely different combination of ingredients than that of the preceding chiller.

---

[2] "The customer may use whatever decontamination solution it chooses in the KillCAT and may change the decontamination solution from time to time. Likewise, chillers (whether Defendant's chillers or chillers made by other manufacturers) are not limited to use with any specific liquids solutions." Pl.'s Memo., Ex. H.

9
Case 5:09-cv-00023-BR   Document 78   Filed 08/20/10   Page 9 of 19

Based on the forgoing, the Court concludes there exists with respect to at least one sale and use of Defendant's KillCAT product an instance of direct infringement by a customer of Defendant. As a "finding of infringement can rest on as little as one instance of the claimed method being performed during the pertinent time period[,]" the Court is thus satisfied that further discussion on the issues of contributory infringement and inducement to infringe is proper. *Lucent Technologies, Inc. v. Gateway*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).

### b. Contributory Infringement Under 35 U.S.C. § 271(c)

Plaintiff first claims that Defendant is a contributory infringer of Plaintiff's '173 patent under 35 U.S.C. § 271(c).

A defendant is liable as a contributory infringer if it

> offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination, or composition or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

35 U.S.C. § 271(c) (2009). In order to succeed on a claim of contributory infringement, Plaintiff must first evidence the existence of at least one instance of direct infringement. *BMC Resources, Inc.*, 489 F.3d at 1379. As discussed *supra* in Section B(3)(a), Plaintiff has sufficiently established a predicate act of direct infringement as required to support a claim of indirect infringement. *BMC Resources, Inc.*, 489 F.3d at 1379. Plaintiff must then demonstrate that [1] the "defendant 'knew that the combination for which its components were especially made was both patented and infringing' and [2] that defendant's components have 'no substantial non-infringing uses.'" *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d

10

Case 5:09-cv-00023-BR   Document 78   Filed 08/20/10   Page 10 of 19

1293, 1312 (Fed. Cir. 2005) (quoting *Golden Blount, Inc. v. Robert H. Person Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004)).

### 1. Defendant Knew Combination for Which Components Made Both Patented and Infringing

Plaintiff must demonstrate that Defendant knew the combination for which the components of KillCAT were especially made and designed was both patented and infringing. *Cross Medical Products, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005).

First, the Court addresses Defendant's knowledge of the patent itself. The Court is satisfied that Plaintiff properly placed Defendant on notice regarding both the '173 patent and the allegedly infringing use of the KillCAT product. The record evidences that Plaintiff delivered a "cease and desist" letter to Defendant on January 18, 2008, putting Defendant on notice of the publication of its '173 patent application. Pl.'s Compl., Ex. B [DE-1]. Plaintiff delivered another notice on January 22, 2009, within 30 days of the '173 patent's issuance, demanding that Defendant cease and desist from all sales activities associated with the allegedly infringing KillCAT product. Pl.'s Memo., Ex. R. For these reasons, and in light of Defendant's non-contention of this point, the Court concludes that Defendant was aware of the '173 patent.

Next, the Court considers whether Defendant knew that the combination for which the components of KillCAT were "especially made and adapted" was infringing of the claims of the '173 patent. As discussed in detail, *supra* Section B(3)(a), this Court's analysis of infringement does not require claim construction, and the Court need only discuss whether the allegedly infringing product contains all elements of the claims at issue in this motion. The only element that is disputed by Defendant pertains to whether or not the KillCAT is especially made or adapted for use with a "decontamination solution having a different composition than the liquid solution in the chiller such that the decontamination solution in [KillCAT] has more rapid

11
Case 5:09-cv-00023-BR   Document 78   Filed 08/20/10   Page 11 of 19

antimicrobial effect than the liquid solution in [the] chiller." Based on the uncontroverted record, the Court finds that KillCAT is designed for use with chemicals of a different composition than the solution in a preceding chiller.

First, the record evidences that the KillCAT was manufactured with a chemical introduction and monitoring system consistent with a design anticipating the use of chemicals of a different composition than that of the solution in a preceding chiller. Pl.'s Memo., Ex. F. The KillCAT is designed with two chemical introduction ports. *Id.* As it stands uncontroverted on the record, the chemical ports are for the rapid introduction of chemical solutions into the KillCAT device. Pl.'s Memo., Ex. E. The KillCAT also comes with chemical monitoring equipment. Pl.'s Memo., Ex. F. The monitors maintain the pH or acidic levels of chemical solution in the KillCAT device. Pl.'s Memo., Ex. E. Although not dispositive in and of itself, the presence of chemical ports and a chemical monitoring system, separate from whatever system the preceding chiller is using, is indicative of monitoring and maintaining a solution of a different composition than the chiller water.

Second, the record evidences that using the system in a non-infringing manner (i.e. using solutions of the same composition in both the KillCAT and chiller) would be commercially impractical. As evidenced by the testimony of Defendant's employee, David Andrews, if a customer used the highly acidic solution (1.8—2.2 pH) needed to effectively kill bacteria in the KillCAT in both the chiller and KillCAT device, the poultry would be "damaged" due to the extensive amount of time it would be exposed to the acidic solution. Pl.'s Compl., Ex. E. On the other hand, using a low acid solution such as the 6.5-6.6 pH solution used in chillers in both the chiller and KillCAT, though not damaging to the birds, would have no practical purpose or commercial appeal for the KillCAT. Customers would essentially be purchasing KillCAT for

the purpose of adding a few more seconds on to the dwell time of poultry in their chiller. The record indicates that not one customer has ever procured KillCAT for this purpose. Pl.'s Memo., Ex. O. As Defendant's Mr. Andrews testified, KillCAT is "built and designed strictly for the ability for plants to add chemicals in order to control bacteria of the birds." Pl.'s Memo., Ex. E.

Third, Defendant's advertising of the KillCAT product indicates that Defendant has designed the KillCAT to be used with a chemical solution of a "different composition" than that of chiller water. In one advertisement, Defendant claims the KillCAT is compatible "with a wide range of acidifiers." Pl.'s Memo., Ex. F. Defendant's ad states that "[KillCAT] utilizes and controls the pH using an acidifier to reduce the pH in the 5' section to a level where pathogen survival is minimal." *Id.* Defendant also advertises a chemical monitoring system to ensure that the pH level of the solution in KillCAT "is kept at the correct levels for maximum effectiveness." These claims are indicative of maintaining a solution of a different composition than the chiller water.

Based on the foregoing evidence on the record, the Court concludes that Defendant knew that the KillCAT device was especially made and designed for a method containing *all* elements of Claims 1, 2, 5-10, & 17 of the '173 patent, including the use of a chemical solution of a different composition than the solution in a preceding chiller.

### 2. Substantial Non-Infringing Uses

In order to prove contributory infringement, Plaintiff must also demonstrate that the accused product has no substantial non-infringing uses. *Cross Medical Products, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005). Whether a use is "substantial," rather than just "unusual, far-fetched, illusory, impractical, occasional, aberrant or experimental," cannot be evaluated in a vacuum. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). In

assessing whether an asserted non-infringing use is "substantial," considerations include not only the use's frequency, but also the use's practicality, the invention's intended purpose, and the intended market." *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2009).

The Court reemphasizes and incorporates the discussion above of the impracticability of the KillCAT when used in a non-infringing manner, and notes that it puts particular weight on the testimony of Defendant's President, Michael Miller:

> Q: What other uses do the KillCAT chillers have that you may offer them for?
> A: If somebody wants a real small chiller, you could use a KillCAT, same thing.
> Q: How many installations have you sold for that purpose?
> A: None. None whatsoever. <u>It's too small</u>.

Pl.'s Memo., Ex. O (emphasis added). Miller's testimony stands uncontroverted on the record and leaves little room for debate on the question of "substantial non-infringing uses." The testimony of Defendant's service technician, David Andrews, is also telling. Andrews stated that the KillCAT is "built and designed strictly for the ability for plants to add chemicals." Pl.'s Memo., Ex. E. The Court also notes that two of Defendant's customers, Tyson Foods, Inc and Perdue Inc., have testified that there is no other practical purpose to the KillCAT device aside from use as an antimicrobial device using a solution different from that of the preceding chiller. Pl.'s Memo., Exs. D & P.

Based on this uncontroverted testimony, combined with the Court's earlier conclusion on the impracticability of using a KillCAT and chiller with chemical solutions of the *same* composition (i.e. the averred non-infringing use), the Court concludes that there are no substantial non-infringing uses of Defendant's KillCAT product.

Accordingly, it is the undersigned's conclusion that Defendant is a contributory infringer under 35 U.S.C. § 271(c) of Claims 1, 2, 5-10, & 17 of Plaintiff's '173 Patent.

### c. Inducement to Infringe Under 35 U.S.C. § 271(b)

Plaintiff further claims Defendant has "actively induced" the infringement of Plaintiff's '173 patent and is thus liable as an infringer. Under United States patent law, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). As mentioned above, "active inducement," like contributory infringement, first requires the existence of some act of direct infringement. As discussed *supra* in Section B(3)(a), Plaintiff has sufficiently established a predicate act of direct infringement as required in cases of indirect infringement. *BMC Resources, Inc.*, 489 F.3d at 1379. A defendant has then actively induced those acts of direct infringement and is liable as an infringer when it "knew or should have known its actions would induce actual infringements." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1201, 1317 (Fed. Cir. 2009); *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.3d 544, 554 (Fed. Cir. 1990). "The requirement that the alleged infringer knew or should have known his patent would induce actual infringement necessarily includes the requirement that he or she knew of the patent." *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (citing *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1364 n.4 (Fed. Cir. 2006) (citation omitted)). When ruling on a claim of induced infringement, evidence of active steps to encourage direct infringement, such as "advertising an infringing use or instructing how to engage in an infringing use[,]" can evidence a finding of inducement to infringe under 35 U.S.C. § 271(b). *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005); *see also DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305-06 (Fed. Cir. 2006).

1. Notice of the '173 Patent

Liability for inducement to infringe requires notice of the patent at issue. *DSU Medical Corp.*, 471 F.3d at 1304 (citing *Golden Blount, Inc.*, at 1364 n.4 (citation omitted)). As discussed *supra* in Section B(3)(b)(1), Plaintiff has sufficiently demonstrated that Defendant was on notice of the allegedly infringed upon '173 patent. Furthermore, the record evidences that Defendant attempted to indemnify its customers against potential infringement claims by Plaintiff. The record contains a Hold Harmless Agreement delivered to one of Defendant's potential customers, Pilgrim's Pride, stating:

> [Defendant] agrees to INDEMNIFY AND HOLD HARMLESS Buyer, its employees agents and assigns, and those of any subsidiaries and affiliates, against . . . any claim against it by Morris for Infringement of the Patent arising out of the purchase of the [KillCAT product].

Pl.'s Memo., Ex. S. Based on this uncontroverted evidence, the Court concludes Defendant was on notice of the '173 patent and the alleged infringement.

2. Defendant's Actions

Having established (1) a predicate act of direct infringement and (2) Defendant's knowledge of the allegedly infringed patent, the question becomes whether or not the Defendant knew or should have known that its *specific actions* would induce infringement.

As discussed in detail, *supra* Section B(3)(a), this Court's analysis of infringement does not require claim construction, and the Court need only discuss whether the allegedly infringing product contains all elements of the claims at issue in this motion. The only element that is disputed by Defendant pertains to whether or not the KillCAT is especially made or adapted for use with a "decontamination solution having a different composition than the liquid solution in the chiller such that the decontamination solution in [KillCAT] has more rapid antimicrobial effect than the liquid solution in [the] chiller." Accordingly, Plaintiff must show that

Defendant's actions *do in fact* actively induce customers to use solution with the KillCAT product of a different composition than the solution in the chillers. The Court concludes that Plaintiff has satisfied its burden.

First, Defendant's advertising of the KillCAT product indicates that the system is to be used with a chemical solution of a "different composition" than that of chiller water. In one advertisement, Defendant claims the KillCAT is compatible "with a wide range of acidifiers." Pl.'s Memo., Ex. F. Defendant's ad states that "[KillCAT] utilizes and controls the PH using an acidifier to reduce the PH in the 5' section to a level where pathogen survival is minimal." *Id.* Defendant advertises a chemical monitoring system to ensure the pH level of the solution in KillCAT "is kept at the correct levels for maximum effectiveness." *Id.* This advertising, coupled with the testimony on relative dwell times and differences between chillers and "KillCAT," leaves little doubt that Defendant is advertising KillCAT for use with a chemical solution of a different composition than chiller water.

Second, the record evidences that Defendant's own technicians "set up" the KillCAT products in an infringing manner after they are sold. Andrews, testified to this activity:

> Q: When you install a KillCAT unit, is it one of your responsibilities to program the controller to either the **1.8 or to 2.2 [pH]** or whatever the range is the customer sets up?
>
> A: It it's one that we provided, yes.

Pl.'s Memo., Ex. E (emphasis added). As testimony evidences, the liquid solution in the long chillers that preceded KillCAT is generally kept at around 6.5 pH. Pl.'s Memo., Ex. E. As a bird requires about 110 minutes dwell time in a chiller, to set the pH any lower (i.e. more acidic) would damage the bird. *Id.* The pH scale is logorythmic. Thus, when Defendant's technicians set the KillCAT solution to a pH in the range of 1.8-2.2, they are creating a solution in the

KillCAT nearly 10,000 times more acidic than that of the chiller. In light of these facts, the Court concludes Defendant is inducing infringement with its installation of KillCAT.

Finally, the Court finds Defendant's letter of guarantee to OK Foods as evidence that Defendant has induced others to infringe Plaintiff's patent. This letter, dated March 5, 2008, stated:

> C.A.T Inc. will guarantee that the KILLCAT will produce pathogen results that are 5% less positive leaving the final chillers, when the proper ph level is maintained in the KILLCAT at all times. We require that the ph be kept under an average of 2.2ph or less, and the main chiller water be chlorinated.

Pl.'s Memo., Ex. N. Again, there is no genuine dispute as to the fact that a 2.2 pH solution could not be used as chiller water. Defendant has constructed a guarantee contingent on the use of a solution "of a different composition" than chiller water. Essentially, Defendant, while not instructing its customers to use the product in a directly infringing manner, is establishing an incentive for them to do so. This is inducement. Accordingly, as evidenced by this guarantee, the Court is further convinced that Defendant has induced infringement.

Based on the uncontroverted evidence set forth by Plaintiff, particularly with regards to Defendant's actions in (1) advertising KillCAT and its purposes, (2) installing KillCAT, (3) and guaranteeing KillCAT's performance, the Court finds that Defendant's actions have actively induced infringement of Plaintiff's '173 patent. Accordingly, the Court concludes that, in addition to contributory infringement, Defendant's actions constitute inducement to infringe under 35 U.S.C. § 271(b).

## CONCLUSION

For the forgoing reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment of Infringement of Claims 1, 2, 5-10, 12 & 17 of U.S. Patent No. 7, 470,173 be **GRANTED**.

The clerk shall send copies of this Memorandum and Recommendation to the parties, who have fourteen days (14) after receiving it to file written objections. Failure to file timely written objections bars or may bar an aggrieved party from receiving a *de novo* review by the District Court on an issue covered in the Report and, except on grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

This 20th of August, 2010.

David W. Daniel
United States Magistrate Judge