**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

**NO. 5:09-CV-23-BR**

| | | |
|---|---|---|
| MORRIS & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER AND** |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| COOLING & APPLIED | ) | |
| TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Plaintiff's motion for summary judgment on Defendant's invalidity contentions as to U.S. Patent No. 7,470,173 [DE-73], which has been referred to the undersigned for Memorandum and Recommendation. Plaintiff's Motion to Strike [DE-108] a Notice of Citation [DE-107] filed by Defendant has also been referred to the undersigned for ruling. For the reasons stated below, it is hereby **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART**, and it is hereby **ORDERED** that Plaintiff's Motion to Strike be **GRANTED**.

<u>**STATEMENT OF THE CASE**</u>

Plaintiff, Morris & Associates, Inc. ("Morris"), is a North Carolina corporation involved in the manufacture of industrial refrigeration equipment for both domestic and worldwide markets. Defendant, Cooling and Applied Technologies, Inc. ("CAT"), is an Arkansas corporation also involved in the manufacture and sale of refrigeration equipment. This dispute involves Defendant's alleged infringement of Plaintiff's U.S. Patent No. 7,470,173 (the "'173 patent"), which is entitled Post Chill Decontamination Tank. The '173 patent was filed on June

13, 2007, subsequent to a provisional application filed on June 13, 2006, also entitled Post Chill Decontamination Tank.

The record demonstrates that a problem in poultry processing concerns bacterial contamination. The "evisceration" process of poultry leaves bird carcasses particularly vulnerable to bacterial contamination. Because bacteria grows much more rapidly at warmer temperatures than colder ones, poultry processors are required to lower the temperature of eviscerated birds from a live body temperature of 90-100° F to less than 40° F shortly after slaughter. In the poultry industry, a large device known as a "chiller" is used to accomplish this lowering of body temperatures. Chillers are large chambers that pass recently eviscerated birds through cool water until the birds' body temperatures drop below 40° F. However, chillers do not always adequately reduce bacteria to regulation levels.

Plaintiff thus claims it developed the Post Chill Decontamination Tank for the purpose of treating and reducing the microbial contamination on bird carcasses after the birds are removed from the chiller. The Post Chill Decontamination Tank is a smaller chamber that attaches to the end of an aforementioned chiller tank. Once the poultry passes through the larger chiller tank, the chilled poultry exits into the Post Chill Decontamination Tank. In this tank, the poultry is submerged and pushed by paddles through a concentration of chemicals that rapidly reduce the bacteria levels of the poultry. This results in a cheap, quick, and effective way to reduce the levels of bacteria on freshly slaughtered poultry.

Defendant manufactures and sells a competing device known as the "KillCAT." KillCAT is described as a pathogen reduction system made and designed to meet and exceed the stringent food safety regulations that are in place today. Essentially, the KillCAT system is a five foot tank that sits at the end of a larger chiller tank. Birds exit the chiller tank and enter the

KillCAT before being pushed through a liquid solution by rotating paddles. The KillCAT is designed with two chemical introduction ports. The chemical ports are for the rapid introduction of chemical solutions into the KillCAT device. The KillCAT also comes with chemical monitoring equipment, which maintains the pH or acidic levels of chemical solution in the KillCAT device.

Plaintiff filed its complaint in this action on January 22, 2009, alleging that Defendant's use, sale, import, and offer of the KillCAT system constitutes direct infringement, contributory infringement, and/or inducement to infringe one or more claims of Plaintiff's '173 patent in violation of 35 U.S.C. § 271. On January 13, 2010, Plaintiff filed a motion for summary judgment on the issue of infringement [DE-42], and on March 3, 2010, Plaintiff filed a motion for preliminary injunction [DE-49]. On September 20, 2010, Senior Judge Britt, adopting the undersigned's Memorandum and Recommendation, granted summary judgment to Plaintiff, finding that Defendant infringed claims 1, 2, 5-10, 12 & 17 of the '173 Patent. [DE-97.] On October 20, 2010, Senior Judge Britt, adopting the undersigned's Memorandum and Recommendation, granted Plaintiff a preliminary injunction. [DE-101.]

On August 12, 2010, Plaintiff filed the instant motion for summary judgment on Defendant's invalidity contentions as to the '173 Patent, to which Defendant has filed a response [DE-86] and Plaintiff a reply [DE-94]. On December 14, 2010, Defendant filed a notice of citation [DE-107], which is the subject of a motion to strike filed by Plaintiff [DE-108]. The motions presently before the Court are now ripe.

## DISCUSSION

### I.     Motion to Strike

Plaintiff has moved to strike a Notice of Citation filed by Defendant. The notice stated that on November 29, 2010, the United States Supreme Court granted a petition for writ of certiorari in the case of *Microsoft Corp. v. i4i Limited Partnership*, 598 F.3d 831 (Fed. Cir. 2010), *cert. granted*, 131 S.Ct. 647 (U.S. Nov. 29, 2010) (No. 10-209) concerning whether the patent invalidity defense raised by Microsoft must be proved by clear and convincing evidence. Attached to the Defendant's notice were the petition for certiorari, the brief in opposition, and the petitioner's reply brief.

Plaintiff contends in its motion to strike the notice that there is no basis for the filing and that it is not controlling authority that may be filed pursuant to Local Civil Rule 7.1(g). Defendant responded that "[i]f the United States Supreme Court alters the law as to the standard of evidence to invalidate a patent, that decision will become controlling authority and will almost certainly have a direct impact on the instant case." Def.'s Mem. in Resp. at 6. The Court finds "if" to be the operative word. The law at present is unchanged from when Defendant filed its response, and the Supreme Court has yet to hear arguments in the case. Accordingly, the Court finds that the petition for certiorari and briefs filed by Defendant are not controlling and have no impact on the Court's ruling at this time. The Court also notes that the notice was filed approximately three months after the completion of briefing on the pending summary judgment motion and that the rules cited by Defendant do not appear to authorize such a filing.

Accordingly, it is hereby **ORDERED** that Defendant's Notice of Citation [DE-107] be **STRICKEN** from the record.

## II.     Motion for Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, *Anderson*, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this Court has stated, summary judgment is not a vehicle to resolve disputed factual issues. *Faircloth v. United States*, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. *Anderson*, 477 U.S. at 249. In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curium). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. *Faircloth*, 837 F. Supp. at 125.

## B. Analysis

In Defendant's Amended Preliminary Non-Infringement and Invalidity Contentions, Defendant asserted four invalidity contentions against the '173 patent and raised two potential contentions that it might assert based on further discovery. The two later contentions have not been asserted, as confirmed by Defendant's response to Plaintiff's summary judgment motion in

which Defendant contends that the '173 patent is invalid under the following four invalidity contentions: (1) At least Claims 1-2, 5-10, 12 and 17 are invalid as anticipated by a prior offer for sale under 35 U.S.C. § 102(b); (2) At least Claims 1-2, 5-10, 12 and 17 are invalid as anticipated under 35 U.S.C. § 102(a) in that the invention of the '173 patent was known or used by others before the date of invention of the '173 Patent; (3) At least Claims 1-2, 5-10, 12 and 17 are invalid as anticipated by a prior public use under 35 U.S.C. § 102(b); and (4) All Claims of the '173 patent are invalid under the written description requirement of 35 U.S.C. § 112, first paragraph, because the claims were amended during prosecution of the '173 patent to introduce new matter not supported by the application as filed. The Court will address each invalidity contention in turn.

### 1. § 102(b) On-Sale Bar

Plaintiff contends that there is no factual dispute regarding the on-sale bar and that this Court has already determined, at the preliminary injunction stage, that Defendant cannot establish invalidity based on a prior offer for sale. On Plaintiff's motion for a preliminary injunction, Senior Judge Britt found that, based on the current record, "Morris has shown, more likely than not, that it can withstand CAT's challenges to the validity of the '173 patent." Oct. 20, 2010 Order [DE-101]. The only validity challenge Defendant asserted at the preliminary injunction stage was the on-sale bar. However, because the preliminary injunction decision was based on the record at that time and because the applicable standard is somewhat different on summary judgment, the Court must now reconsider the issue.

35 U.S.C. § 102(b) provides that "[a] person is entitled to a patent unless . . . the invention was . . . on sale in this country, more than one year prior to the date of application for patent in the United States." In *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 56 (1998), the

Supreme Court held that the on-sale bar applies to a patent when prior to the critical date (1) the invention for which a patent is sought has been the subject of a commercial offer for sale, and (2) the invention was ready for patenting. *Id*. The "ready for patenting" prong can be proven by showing either reduction of the invention to practice or proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention. *Id*. The "critical date" for purposes of § 102(b) is the date one year prior to the date of application for patent. *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009). "Whether a patent is anticipated under section 102(b) is a question of fact." *Schumer v. Laboratory Computer Systems, Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002) (citing *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 20, 57 (Fed. Cir. 2000)). Thus, to prevail at summary judgment, Plaintiff must show that no genuine issue of material fact exists and that no reasonable juror could conclude that Defendant had demonstrated by clear and convincing evidence that the invention was offered for sale and ready for patenting prior to the critical date. *Engineered Products Co. v. Donaldson Co., Inc.*, 165 F.Supp.2d 836, 860 -861 (N.D. Iowa 2001) ("As the moving party, without the burden of proof on the matter, [plaintiff] is entitled to summary judgment only if it can demonstrate that no reasonable jury could conclude that [defendant] had demonstrated by clear and convincing evidence that an embodiment of the '456 patent had been put into public use prior to June 19, 1977.")

### a. Commercial Offer for Sale

To establish a commercial offer for sale, one "must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell more than one year before the application for the subject patent." *STX, LLC v. Brine, Inc.*, 211 F.3d 588, 590 (Fed. Cir. 2000). "Only an

offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance, constitutes an offer for sale under §102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001). In assessing a § 102(b) invalidity claim, a court must determine whether or not something is a commercial offer for sale under the law of contracts as generally understood. *Id.* at 1047. At its most basic conception, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). "What constitutes an offer will depend on the facts of the particular case." *Partsriver, Inc. v. Shopzilla, Inc.*, No. C09-811 CW, 2009 WL 2591355, at *4 (N.D. Cal. 2009).

At issue here is whether Defendant's alleged sale or offer to sell its ozone generator and "OzCAT" tank on May 31, 2005 constitutes a commercial offer for sale. Plaintiff contends that the document presented to Tyson Foods, Inc. ("Tyson") on May 31, 2005 (the "May 31, 2005 Document") was not a commercial offer for sale because (1) it was a budgetary proposal; (2) neither Tyson not Defendant believed it was a binding offer for sale; and (3) Defendant provided a more detailed proposal to Tyson on July 12, 2005 that would have been unnecessary had the May 31, 2005 document been a binding offer for sale. Defendant disputes each of Plaintiff's contentions and asserts that a material issue of genuine fact exists as to whether Defendant intended and believed that the May 31, 2005 Document was an offer for sale that could be accepted by Tyson. The Court agrees that genuine issues of material fact preclude summary judgment on whether the May 31, 2005 Document constituted a commercial offer for sale.

In support of its position, Defendant relies on, among other things, the September 3, 2010 Declaration of its President, J. Barton Langley, a Vice President at the time the May 31, 2005

Document was presented to Tyson. Def.'s Resp., Ex. U, Langley Decl. ¶¶ 1-2 [DE-88-10]. In his declaration, Langley stated as follows:

> The letter of May 31, 2005 . . . was intended, understood and believed by CAT to be an offer to sell an OzCAT to Tyson Foods, Inc. [].

> Tyson solicited the offer and it was my expectation that Tyson would promptly accept the offer.

> At the time the offer was made, CAT had already expended considerable time and money in preparation to construct the OzCAT in anticipation of an acceptance of the offer. A small portion of the expended time and money is indicated by the Purchase Order to Ozone Water Systems dated March 1, 2005 [] regarding the purchase of ozone generating equipment for use in the OzCAT project. Likewise, CAT personnel were already expending time on the OzCAT project as evidenced by the Affidavit of Steven L. Williams, a CAT draftsman who prepared drawings for the OzCAT project, including those dated April 6, 2005 [].

*Id*. ¶¶ 2-4. The Court acknowledges that Langley's declaration, if viewed in isolation, appears conclusory as to the ultimate issue of whether Defendant made Tyson a binding offer with its May 31, 2005 Document. However, Langley's assertions have some support in the record, e.g., the May 26, 2005 internal Tyson email indicating that Tyson expected a proposal within the week (Def.'s Resp., Ex. C3 [DE-86-5]). Therefore, the Court finds that a genuine issue of material fact exists as to whether Defendant and Tyson believed the May 31, 2005 Document to be an offer for sale. To be clear, the Court has not changed its view from the preliminary injunction stage that it is more likely than not that Plaintiff can withstand an invalidity challenge based on the on-sale bar. Yet, because there are material facts in dispute, the Court cannot say that *no reasonable juror* could find that Defendant had demonstrated by clear and convincing evidence that the May 31, 2005 Document was an offer for sale.

### b. Ready for Patenting

To invalidate a patent based on the on-sale bar, the Defendant must show that the invention was both the subject of a commercial offer for sale and ready for patenting. Accordingly, the Court must continue its inquiry. To establish that the invention was ready for patenting when the alleged offer was made on May 31, 2005, Defendant must show either reduction of the invention to practice or proof that the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention prior to the critical date. *Pfaff*, 525 U.S. at 67-68. Defendant does not contend that the OzCAT was reduced to practice before the critical date and, rather, relies on the second prong, more specifically, that it made sufficiently enabling disclosures of its invention at a March 22, 2005 meeting with Tyson.

Plaintiff contends that there was no sufficiently enabling disclosure because (1) Defendant can cite to no documents or records supporting its claims of the March 22, 2005 enabling disclosure; (2) uncorroborated oral testimony is insufficient; (3) the discussion regarding OzCAT at the March 22, 2005 meeting was insufficiently specific to enable a person skilled in the art to practice the invention; and (4) the OzCAT never worked as intended. Defendant disputes each of Plaintiff's contentions and asserts that there is a genuine issue of material fact as to whether the OzCAT was a complex machine that could not have been the subject of an enabling disclosure during the meeting between Tyson and CAT on March 22, 2005. The Court agrees that genuine issues of material fact exist that preclude summary judgment as to whether an enabling disclosure occurred.

In support of its position, Defendant relies on the testimony of Michael E. Miller, Defendant's present CEO, who was Defendant's President in 2005; Michael Freer, a Tyson Engineer; Chris Graves, Tyson's Clarksville Complex Manager; and Steven L. Williams, a CAD

draftsman employed by Defendant.  In sum, Miller stated that, at the March 22, 2005 meeting between Tyson and Defendant, Tyson explained its requirements for what became known as the OzCAT:

> The dip tank would use ozonated water. Instead of a conventional dip tank that used shackles or conveyors to lift the poultry carcasses out of the tank, the dip tank would be formed from an unloader section of a FatCAT chiller with a paddle wheel unloader but without the auger. As with the FatCAT chiller, an entrance wall would be added to define a chamber for holding a liquid with an antimicrobial chemical.  Such a dip tank would have the advantages of a smaller footprint and improved mechanical reliability. Since the poultry carcasses would tend to float across the top of the tank, it was also decided to add a partition or baffle that was open at the bottom and that extended across the top of the tank so that the poultry carcasses would be forced to the bottom of the tank before being lifted up and out of the tank by the paddle unloader.

Def.'s Resp., Ex. B, Miller Decl. ¶ 10 [DE-86-2].

Plaintiff, citing *Finnegan Corp. v. Int. Trade Comm.*, 180 F.3d 1354, 1369 (Fed. Cir. 1999), argues that uncorroborated witness testimony is insufficient to invalidate a patent. However, the Federal Circuit has recognized that proof of an oral disclosure may support a finding that an invention is ready for patenting.  *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1311-13 (Fed. Cir. 2001), cert. denied, 534 U.S. 1018 (2001) (finding that district court did not err in concluding that inventor's explanation of invention to a coworker was sufficiently specific to enable co-worker to understand invention and write the software necessary to implement the invention and thus was an enabling disclosure under the on sale bar).

Defendant contends that Miller's testimony is corroborated by that of (1) Freer, who testified in his deposition that the March 22, 2005 meeting was prompted by an idea by a Roger Turney of Tyson for a chiller unloader section that would be placed after the final chill and would not have belts, *id.*, Ex. E1 at 37/20-25 & 39/2-23 [DE-87-1], and that at the March 22, 2005 meeting it was discussed that a divider extending across the top of the tank would be

needed, *id*. at 203/18-204/8; (2) Graves, who testified at his deposition that the March 22, 2005 meeting was to discuss what kind of options or ideas Defendant had and that at that meeting they "kind of came up with the idea or application for the OzCAT, KILLCAT, type scenario[,]" *id*., Ex. F1 at 9/20-10/3 [DE-87-3]; and (3) Williams, who stated in his affidavit that, in late March or early April, Miller explained to him a project that entailed "a dip tank to follow an existing FatCAT chiller," which included the same details stated by Miller above, and that Miller asked him to prepare drawings of the dip tank based on that description, *id*., Ex. M, Williams Aff. ¶ 2 [DE-88-2]. Plaintiff also relies on the deposition testimony of Tyson representatives Freer and Graves to support its position that no enabling disclosure could have been or was, in fact, made at the March 22, 2005 meeting. *See* Pl.'s Mem. at 5, ¶¶ 5, 10-12 (Freer testified that the purpose of the meeting was to discuss "possibilities" of using ozone as an anti-microbial on birds exiting the chiller and that the meeting was "strictly a conversation" with no notes or drawings; Graves testified that "there were more questions than anything" in the discussion about the different ways ozone could be used.). This competing testimony as to the content of discussions at the March 22, 2005 meeting creates a genuine issue of material fact, as to whether the discussion regarding OzCAT at the March 22, 2005 meeting was sufficiently specific to enable a person skilled in the art to practice the invention. Again, the Court notes that it has not changed its view from the preliminary injunction stage regarding the likelihood of outcome. Notwithstanding, the Court cannot say that *no reasonable juror* could find that Defendant had demonstrated by clear and convincing evidence that the OzCAT could have been, and was, in fact, the subject of an enabling disclosure on March 22, 2005.

Having concluded that genuine issues of material fact are in dispute regarding Defendant's on-sale bar challenge to the '173 patent's validity, it is **RECOMMENDED** that the Plaintiff's motion for summary judgment on this defense be **DENIED**.

### 2. Public Knowledge or Use Under § 102(a)

Plaintiff contends that Defendant's invalidity contention that the '173 patent is invalid as anticipated under 35 U.S.C. § 102(a) must fail based on lack of public knowledge or public use as evidenced by confidentiality agreements between Defendant and Tyson. Defendant counters that the use of the OzCAT at Tyson's Clarksville, Arkansas facility beginning in September of 2005 was an invalidating public use of the invention before the date of invention of the '173 patent and that the confidentiality agreements did not apply to the OzCAT.

"A person shall be entitled to a patent unless . . . the invention was known or used by others in this country . . . before the invention thereof by the applicant for a patent[.]" 35 U.S.C. § 102(a). "If the invention was known to or used by others in this country before the date of the patentee's invention, the later inventor has not contributed to the store of knowledge, and has no entitlement to a patent. Accordingly, in order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998). Furthermore, secret use by a third party is not a "public use bar" under § 102(a). *Id.* at 1371.

Plaintiff specifically argues that Defendant executed confidentiality agreements prior to the March 22, 2005 and May 31, 2005 meetings with Tyson and again on August 3, 2005, which evidence that the development and testing or use of the OzCAT was secretive and not public in nature. Plaintiff further argues that after the OzCAT was installed in Tyson's Clarksville facility, it remained inaccessible to the public. Defendant counters that none of the confidentiality

agreements specifically apply to the OzCAT, with the first two being generic form agreements and the third relating only to anti-microbial testing of the ozone generating apparatus and not to the OzCAT itself. Defendant further argues that the fact that Tyson's facility was not open to the public did not preclude dissemination of information related to the OzCAT to the public.

The first two "confidentiality agreements" are generic documents that appear to be applicable to any visitor to the Tyson facility. Pl.'s Mem., Exs. D & F [DE-77-7 & 77-11]. The third document entitled "Confidentiality Agreement" differs from the first two in that it was executed by both Defendant and Tyson and it relates specifically to the parties "business relationships relating to antimicrobial testing of ozone generating apparatus manufactured by Ozone Safe Foods." *Id*., Ex. I [DE-77-14]. However, this agreement also excluded information known prior to disclosure by the disclosing party. *Id.* ¶ 4(a). Therefore, considering the evidence in the light most favorable to the non-moving party, it is plausible that this document pertained only to the ozone generating apparatus and not to the OzCAT itself, which Defendant contends is simply a variation on the FatCAT it had been manufacturing since 1999. The email chain regarding the need for the confidentiality agreement to be executed before "the equipment" is installed does not change the result, because the email specifically refers to Ozone Safe Foods and, therefore, does not necessarily contradict the above interpretation. Pl.'s Reply, Ex. U [DE-94-6]. Likewise, the testimony of Freer that the OzCAT could not be installed without confidentiality agreements in place does not necessarily contradict the above interpretation, because it is not detailed as to what, in fact, was being kept confidential. *Id*., Ex. Q at 109/13-18 [DE-94-2]. Finally, Freer's testimony that visitors to the Tyson facility are supposed to sign an access agreement but that the policy's enforcement is "somewhat varied" and that Tyson's facility does not have an "open door policy" are not sufficient to establish that OzCAT's testing

in the Tyson facility beginning in September 2005 was not public use. *See Bennett Regulator Guards, Inc. v. Canadian Meter Co., Inc.*, No. 05-1425, 2006 WL 1667946, at *5 184 Fed. App'x 977, 982 (Fed. Cir., June 19, 2006) (denying summary judgment where genuine issue of material fact existed regarding public accessibility of defendant's knowledge where defendant and third party conducted testing of equipment). Therefore, based on the lack of clarity regarding what aspects of the OzCAT were, in fact, kept confidential, the Court finds that a genuine issue of material fact exists regarding the public nature and use of the OzCAT prior to the date of invention of the '173 patent.

Having concluded that genuine issues of material fact are in dispute regarding Defendant's public knowledge or use challenge under § 102(a), it is **RECOMMENDED** that the Plaintiff's motion for summary judgment on this defense be **DENIED**.

### 3. Prior Public Use under § 102(b)

Plaintiff contends that Defendant cannot break the priority claim between the '173 patent and its '203 provisional application, which is necessary to prevail on the § 102(b) prior public use defense. Plaintiff further contends that the OzCAT project was not public. Defendant counters that certain terms that are limitations of each claim of the '173 patent are not disclosed by the provisional application and that the '173 patent is not entitled to the priority date of the provisional application filed on June 13, 2006.

"A person shall be entitled to a patent unless . . . the invention was in public use . . . more than one year prior to the date of the application for patent[.]" 35 U.S.C. § 102(b). Having already determined that a genuine issue of material fact exists as to the public nature of the use, the Court will turn to the issue of the priority claim between the '173 patent and its '203 provisional application. "[F]or the non-provisional utility application to be afforded the priority

date of the provisional application, the two applications must share at least one common inventor and the written description of the provisional must adequately support the claims of the non-provisional application[.]" *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002). "Whether a patent is anticipated under section 102(b) is a question of fact." *Schumer*, 308 F.3d at 1315 (citing *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 20, 57 (Fed. Cir. 2000)). "Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory." *Id*. at 1315-16 (citing *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360 (Fed.Cir.2002)).

Plaintiff filed the '203 provisional application on June 13, 2006 and the '173 patent application on June 13, 2007. In order for Defendant to prevail on its prior public use defense under § 102(b), the alleged invalidating public use must have occurred more than one year prior to the application date of the patent. Defendant alleges that the invalidating public use occurred when the OzCAT was installed in Tyson's facility in September of 2005. Accordingly, if the '173 patent is entitled to the priority date of the '203 provisional patent, June 13, 2006, then the alleged public use did not occur more than one year prior to the application date as required by § 102(b). Therefore, in order to prevail on this defense, Defendant would have to break the priority claim between the '173 patent and its '203 provisional application.

Defendant attempts to break the priority claim by showing that the claim elements "differing composition" and "differing content" found in the '173 patent are not supported by the '203 provisional application. Plaintiff attempts to defend the priority claim through the declaration of its expert, Shelly McKee, Ph.D., a research and teaching professor in poultry

science at Auburn University. Dr. McKee concluded "that the '203 provisional application supports the claims of the '173 patent, including for the claim elements 'differing composition' and differing content[.]'" Pl.'s Mem., Ex. P ¶ 12. In support of her conclusion, Dr. McKee points to portions of the '203 provisional application that support the concepts of "different composition" and "different content" and then explains how each provision supports those terms. *Id*. ¶¶ 12-24. Defendant argues that there is nothing in the record to show that Dr. McKee is a person of ordinary skill in the art and that her opinions do not change the fact that the provisional application does not implicitly or explicitly support the limitation that the liquid in the post chill decontamination tank is different than the liquid in the immediately preceding chiller. The Court finds that Defendant's arguments lack merit.

As to the qualifications of Dr. McKee, Defendant provides no substantive support for its conclusory statement that she is not one of ordinary skill in the art of poultry decontamination. Dr. McKee has a Ph.D. and post doctorate degree in poultry science and conducts research in poultry meat safety "using antimicrobial interventions during poultry meat processing and further processing to determine ways to reduce" various bacteria in poultry processing. *Id*. ¶¶ 4-5. The process at issue in this case falls squarely within Dr. McKee's area of expertise.

As to the substance of Dr. McKee's opinions, the Court finds her testimony reasoned and persuasive. For example, the introductory paragraph of the '203 provisional application provides as follows:

> The intent of this invention is to provide a post chill decontamination tank for placement adjacent the bird discharge end of the poultry chiller in which birds can be treated to reduce microbial contamination after they are removed from the chiller. The treatment tank is provided with mechanisms to assure a controlled residence or treatment time for the birds, and to remove the birds from the tank after treatment. **The process may comprise the application of chemical treatments such as chlorine, ozone or other biocides** and may be further augmented by mechanical systems such as jets, sprays, agitators, wipers, or other

means to enhance contact with and efficacy of the biocidal agent. **The post chill decontamination tank may be equipped with a control system for maintaining the chemical environment in the tank at the condition desired for effective bacterial decontamination.**

Pl.'s Mem., Ex. O (emphasis added) [DE-77-21]. Dr. McKee stated that she recognized the chemicals identified in the first highlighted statement "as having to be different in their respective presence/absence and/or concentration between a post chill decontamination tank and a preceding chiller based on the size of the respective units and the poultry dwell time in each unit." Pl.'s Mem., Ex. P ¶ 13 [DE-77-22]. Dr. McKee further stated that the second highlighted statement indicated to her that "the contents of the post chill decontamination tank would likely be different than those in the preceding chiller due to the post chill decontamination tank having its own chemical environment control system to achieve effective bacterial decontamination, which . . . will result in a more rapid bacterial reduction treatment solution than that in the chiller that typically comprises chilled water essentially." *Id.* ¶ 14.

The Court agrees with Dr. McKee's conclusions, and, importantly, Defendant has provided no expert or other testimony to counter Dr. McKee's testimony. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, but must come forward with specific facts showing that there is a genuine issue for trial.) (Internal quotations and citations omitted). Accordingly, the Court concludes, in reliance on Dr. McKee's declaration, that the '203 provisional application adequately supports the "different composition" and "different content" claims of the '173 patent. Because Defendant cannot break the priority claim between the '173

patent and its '203 provisional application, it cannot show that the invention was in public use more than one year prior to the date of the application for patent.[1]

Having concluded that no genuine issues of material fact are in dispute regarding support for the terms "different content" and "different composition" in the '203 provisional application, Defendant cannot, as a matter of law, prevail on its § 102(b) prior public use defense, and it is **RECOMMENDED** that Plaintiff's motion for summary judgment on this defense be **GRANTED**.

### 4. Written Description Requirement of 35 U.S.C. § 112

Plaintiff contends that the parties' agreement in the Joint Claim Construction Statement as to the meaning of "different content" and "different composition" moots any issue as to the written description requirement of § 112 and that the '203 provisional application, in fact, supports these claims in the '173 patent. Defendant contends that the '203 provisional application contains no reference comparing the liquid in the post chill decontamination tank to the liquid in the chiller and that, consequently, the claims of the '173 patent are invalid as they introduce "new matter" not contained in the '203 provisional application.

The first paragraph of § 112 provides as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

---

[1] The Court's conclusion here that the '173 patent is entitled to the priority date of the '203 provisional application has no impact on the Court's earlier analysis of the on-sale bar under § 102(b), because the alleged invalidating sale occurred on May 31, 2005 and the alleged enabling disclosure occurred on March 22, 2005, both of which are more than one year prior to the provisional application date of June 13, 2006. Likewise, it has no impact on the Court's earlier analysis of the public knowledge or use defense under § 102(a), because under § 102(a) the invalidating knowledge or use must occur before invention, not one year prior to the application date as under § 102(b).

35 U.S.C. § 112. An amendment may not introduce new matter not contained within the written description. 35 U.S.C. § 132. "[P]rohibiting adding new matter to the claims has properly been held enforceable under § 112, first paragraph." *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1348 (Fed. Cir. 2010). The Court has already concluded that the '203 provisional application adequately supports the "different composition" and "different content" claims of the '173 patent and, therefore, their inclusion in the '173 patent does not violate the new matter prohibition of § 132.

Having concluded that no genuine issues of material fact are in dispute regarding support for the terms "different content" and "different composition" in the '203 provisional application, Defendant cannot, as a matter of law, prevail on its § 112 written description defense, and it is **RECOMMENDED** that Plaintiff's motion for summary judgment on this defense be **GRANTED**.

## CONCLUSION

It is hereby **RECOMMENDED** that Plaintiff's motion for summary judgment [DE-73] be **GRANTED IN PART** as to Defendant's anticipation defense of prior public use under § 102(b) and Defendant's written description defense under § 112 and **DENIED IN PART** as to Defendant's anticipation defenses of on-sale bar under § 102(b) and prior knowledge or use under § 102(a). It is hereby **ORDERED** that Plaintiff's motion to strike [DE-108] be **GRANTED**.

The clerk shall send copies of this Memorandum and Recommendation to the parties who have fourteen days (14) after receiving it to file written objections. Failure to file timely written objections bars or may bar an aggrieved party from receiving a *de novo* review by the District Court on an issue covered in the Report, and, except on grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District

Court.

This the 28th day of February, 2011.

David W. Daniel
United States Magistrate Judge