UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO: 5:09-CV-00023-BR

| | | |
|---|---|---|
| MORRIS & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| COOLING & APPLIED TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the 28 February 2011 Memorandum and Recommendation ("M&R") (DE # 116) of Magistrate Judge David W. Daniel regarding plaintiff Morris & Associates, Inc.'s ("Morris") motion for summary judgment as to defendant Cooling & Applied Techonology, Inc.'s ("CAT") four patent invalidity contentions. Judge Daniel recommends that summary judgment be granted in favor of Morris on two of the contentions and be denied on the other two contentions on the ground that genuine issues of material fact exist. Both parties have filed objections to the M&R and a response to the other party's objections.

## I. BACKGROUND

The dispute in this action regards Morris's U.S. Patent No. 7,470,173 (the '173 patent). This patent issued on Morris's U.S. Non-Provisional Patent Application No. 11/762,142 (the '142 application) filed 13 June 2007, following Morris's U.S. Provisional Patent Application No. 60/813,203 (the '203 application), filed 13 June 2006. The '173 patent is entitled "Post Chill Decontamination Tank." The tank is used to treat and reduce the microbial contamination present on freshly slaughtered poultry. CAT's competing device, the KillCAT, uses a chill tank

system with chemicals to reduce the bacterial contamination of processed poultry.

The court has previously found, as a matter of law, that CAT has infringed certain claims of the '173 patent. (9/20/10 Order, DE #97.) At issue now is the validity of the patent itself.[1]

## II. STANDARD OF REVIEW

The court is required to undertake a *de novo* determination of the portions of the M&R to which the parties object. See 28 U.S.C. § 636(b)(1). With regard to the entry of summary judgment, it should be granted in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993). In making this determination, the court draws all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. Id. "[E]ven though there may be no dispute about the basic facts, still summary judgment will be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts." Morrison v. Nissan Co., 601 F.2d 139, 141 (4th Cir. 1979) (citations omitted).

> When evaluating a motion for summary judgment, the court views the record evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits. Under the patent statutes, a patent enjoys a presumption of validity, which can be overcome only through clear and convincing evidence. Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise. Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to

---

[1] CAT originally raised four invalidity contentions and two potential contentions, but, as Judge Daniel notes, it only advances the four original contentions. (See M&R at 5-6.)

> produce clear and convincing evidence on an essential element of a
> defense upon which a reasonable jury could invalidate the patent.

Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001) (citations omitted), cert. denied, 534 U.S. 1109 (2002).

### III. PATENT INVALIDITY CONTENTIONS

**A. Section 102(b)'s On Sale Bar**

Pursuant to 35 U.S.C. § 102(b), a person is not entitled to a patent if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States." This bar

> "applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale. . . . Second, the invention must be ready for patenting." The latter requirement may be satisfied in at least two ways: "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."

Elan Corp. v. Andrx Pharm., Inc., 366 F.3d 1336, 1340 (Fed. Cir. 2004) (quoting Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67-68 (1998)) (omission in original). "The section 102(b) 'public use' [which is discussed below] and 'on sale' bars are not limited to sales or uses by the inventor or one under the inventor's control, but may result from activities of a third party which anticipate the invention, or render it obvious." In re Epstein, 32 F.3d 1559, 1563 (Fed. Cir. 1994) (citations omitted).

Judge Daniel found that genuine issues of material fact exist as to (1) whether the OzCAT, KillCAT's predecessor, was the subject of a commercial offer sale by virtue of a 31 May 2005 document from CAT to Tyson Foods, Inc. ("Tyson") and (2) whether CAT made a

3

sufficiently enabling disclosure of the OzCAT at a 22 March 2005 meeting with Tyson so as to qualify the OzCAT as "ready for patenting" under § 102(b). Based on these conclusions, Judge Daniel recommends that Morris's motion for summary judgment as to § 102(b)'s on sale bar be denied.

Although Morris states that it disagrees with Judge Daniel's conclusion regarding the commercial offer for sale, it lodges an objection only to his conclusion regarding the "ready for patenting" prong. (Pl.'s Obj., DE # 118, at 3.) In reaching his conclusion that a genuine issue of material fact exists as to whether the OzCAT was ready for patenting, Judge Daniel recognized that the parties relied upon oral testimony about the 22 March 2005 meeting.

> In support of its position, Defendant relies on the testimony of Michael E. Miller, Defendant's present CEO, who was Defendant's President in 2005; Michael Freer, a Tyson Engineer; Chris Graves, Tyson's Clarksville Complex Manager; and Steven L. Williams, a CAD draftsman employed by Defendant. In sum, Miller stated that, at the March 22, 2005 meeting between Tyson and Defendant, Tyson explained its requirements for what became known as the OzCAT:
>> The dip tank would use ozonated water. Instead of a conventional dip tank that used shackles or conveyors to lift the poultry carcasses out of the tank, the dip tank would be formed from an unloader section of a FatCAT chiller with a paddle wheel unloader but without the auger. As with the FatCAT chiller, an entrance wall would be added to define a chamber for holding a liquid with an antimicrobial chemical. Such a dip tank would have the advantages of a smaller footprint and improved mechanical reliability. Since the poultry carcasses would tend to float across the top of the tank, it was also decided to add a partition or baffle that was open at the bottom and that extended across the top of the tank so that the poultry carcasses would be forced to the bottom of the tank before being lifted up and out of the tank by the paddle unloader.

4

> . . . .
> Defendant contends that Miller's testimony is corroborated by that of (1) Freer, who testified in his deposition that the March 22, 2005 meeting was prompted by an idea by a Roger Turney of Tyson for a chiller unloader section that would be placed after the final chill and would not have belts, and that at the March 22, 2005 meeting it was discussed that a divider extending across the top of the tank would be needed; (2) Graves, who testified at his deposition that the March 22, 2005 meeting was to discuss what kind of options or ideas Defendant had and that at that meeting they "kind of came up with the idea or application for the OzCAT, KILLCAT, type scenario[,]" and (3) Williams, who stated in his affidavit that, in late March or early April, Miller explained to him a project that entailed "a dip tank to follow an existing FatCAT chiller," which included the same details stated by Miller above, and that Miller asked him to prepare drawings of the dip tank based on that description. Plaintiff also relies on the deposition testimony of Tyson representatives Freer and Graves to support its position that no enabling disclosure could have been or was, in fact, made at the March 22, 2005 meeting. *See* Pl.'s Mem. at 5, ¶¶ 5, 10-12 (Freer testified that the purpose of the meeting was to discuss "possibilities" of using ozone as an anti-microbial on birds exiting the chiller and that the meeting was "strictly a conversation" with no notes or drawings; Graves testified that "there were more questions than anything" in the discussion about the different ways ozone could be used.).

(M&R at 10-12 (alteration in original) (most citations omitted).)

Judge Daniel ultimately found that this competing testimony as to the content of the discussion at that meeting creates a genuine issue of material fact about whether there was a sufficiently enabling disclosure of the OzCAT at the meeting. (Id. at 12.) Morris argues that CAT, as a matter of law, cannot rely on the uncorroborated testimony of the four "interested" witnesses to show that the OzCAT was ready for patenting (and thereby invalidating the '173 patent).

While not entirely clear, most courts now recognize that corroboration of oral testimony on the issue of patent invalidity is required irrespective of whether the witness is "interested."

5

See, e.g., Netscape Commc'ns Corp. v. Valueclick, Inc., 704 F. Supp. 2d 544, 554 (E.D. Va. 2010) ("[A]lthough the witness's interest in the litigation is irrelevant to whether the corroboration requirement applies in the first instance under *Finnigan [Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir. 1999)], the witness's interest is relevant to the sufficiency of corroboration."); Trading Techs. Int'l, Inc. v. eSpeed, Inc., 513 F. Supp. 2d 969, 977 (N.D. Ill. 2007) ("The need for corroboration holds true regardless of whether the party testifying is interested in the outcome of the litigation or is uninterested, but testifying on behalf of an interested party." (citing Finnigan, 180 F.3d at 1367)).

In terms of the sufficiency of corroboration, the Federal Circuit recently summarized the law:

> Generally, "[c]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent." This requirement stems from the suspect nature of oral testimony concerning invalidating events. As the Supreme Court noted more than a century ago, the "unsatisfactory character" of such testimony "aris[es] from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury. . . ." Although oral testimony asserted to invalidate a patent must be corroborated, as we have explained in a similar context, this court has "not impose[d] an impossible standard of 'independence' on corroborative evidence by requiring that every point . . . be corroborated by evidence having a source totally independent of the [witness]." Rather, this court applies a "rule of reason" analysis to determine whether the testimony introduced has been sufficiently corroborated. Under this analysis, this court evaluates all of the pertinent evidence "so that a sound determination of the credibility of the [witness's] story may be reached." When conducting a rule of reason analysis, this court generally considers the following eight factors:
> (1) the relationship between the corroborating witness and the alleged prior user,
> (2) the time period between the event and trial,
> (3) the interest of the corroborating witness in the

>             subject matter in suit,
>             (4) contradiction or impeachment of the witness'
>             testimony,
>             (5) the extent and details of the corroborating
>             testimony,
>             (6) the witness' familiarity with the subject matter
>             of the patented invention and the prior use,
>             (7) probability that a prior use could occur
>             considering the state of the art at the time,
>             (8) impact of the invention on the industry, and the
>             commercial value of its practice.

Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc., 628 F.3d 1359, 1374 (Fed. Cir. 2010) (alterations in original) (citations omitted).

Based on the foregoing, Morris is correct that CAT must come forward with evidence corroborative of the four witnesses' testimony on which it relies. In response to Morris's objection, CAT does point to documentary evidence to corroborate the testimony: (1) CAT's purchase order dated 1 March 2005, evidencing the order of, what CAT represents to be, an ozone generator and related equipment; (2) Miller's signature on Tyson's Plant Admittance Registry and Access Agreement of 21 and 22 March 2005; (3) drawings dated February/March 2005 of the FatCAT chiller (an existing product of CAT to which a finishing chiller– the OzCAT– was to be added); (4) a 6 April 2005 drawing identified as "OzCAT- Overflow Tank" and drafted by Williams; (5) a 25 May 2005 email from Freer to another Tyson employee noting that Tyson is "working towards testing ozone as a 'finishing' chiller in Clarksville" and stating that "we are still in discussion phase with CAT and the ozone generator supplier" and it will likely take eight weeks before the equipment is ready to test; and, (6) the 31 May 2005 document

from CAT to Tyson, which CAT contends was a commercial offer for sale of the OzCAT.[2] (Def.'s Resp., DE # 119, at 3-5 (citing DE ## 86-5, 86-6, 86-8, 86-9, 87-2, 88-3).)

To be sure, when evaluating the sufficiency of this corroborative evidence, the court must view the testimony from CAT's two employees with skepticism as they are classic "interested" witnesses. See Finnigan, 180 F.3d at 1368-69 (level of witness's interest is determined by whether the witness "is a named party, an employee of or assignor to a named party, or otherwise is in a position where he or she stands to directly and substantially gain by his or her invention being found to have priority over the patent claims at issue." (citation omitted)). The testimony from the two Tyson employees should be subjected to less scrutiny. Tyson (and its employees) would receive minimal direct benefit if the '173 patent were invalidated and thus has minimal interest in this litigation. Furthermore, as Judge Daniel recognized and as quoted above, some of the Tyson employees' testimony actually *favors* Morris's position that an enabling disclosure did not occur at the 22 March 2005 meeting. The four witnesses' testimony occurred four to five years after the meeting– not a particularly long time in terms of litigation. More importantly, the corroborating documentary evidence was created within the period of several months prior to and subsequent to the subject meeting and more than one year prior to Morris's filing of the provisional patent application (i.e., the critical date). Morris emphasizes that none of those documents actually corroborate CAT's contention that a fully enabled disclosure occurred at the 22 March 2005 meeting. (Pl.'s Resp., DE # 120, at 7.) However, CAT's position is that the

---

[2]CAT also cited to this evidence in the sections of its response brief addressing whether disputed material facts exist and describing the development of the OzCAT. (Def.'s Resp. Opp'n Summ. J., DE # 86, at 4, 8-9.) However, because CAT did not specifically argue that the documentary evidence corroborates the oral testimony in its summary judgment brief, (see id. at 17-21), it does not appear that Judge Daniel examined the sufficiency of the documentary evidence. The court does not find this circumstance problematic and will therefore consider whether the oral testimony about the 22 March 2005 meeting which CAT proffers is sufficiently corroborated.

8

enabling disclosure was entirely oral. Case law recognizes that "proof of an oral disclosure may support a finding that an invention is ready for patenting." (10/20/10 Order, DE # 101, at 6 (citing Robotic Vision Sys., Inc. v. View Eng'g, Inc., 249 F.3d 1307, 1311-13 (Fed. Cir.), cert. denied, 534 U.S. 1018 (2001).) In sum, the documentary evidence generally supports CAT's version of events, and the court finds that that evidence sufficiently corroborates the oral testimony CAT proffers.

Considering all the evidence, that is, the testimony and documentary evidence on which CAT relies and the testimony on which Morris relies, the court finds that genuine issues of material fact exist as to the application of § 102(b)'s on sale bar. Accordingly, Morris's objection is OVERRULED.

**B. Section 102(a)'s Knowledge or Use Bar**

Title 35, United States Code, Section 102(a) provides in relevant part that "[a] person shall be entitled to a patent unless– [] the invention was known or used by others in this country . . . before the invention thereof by the applicant for patent." Under § 102(a), "in order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public." Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998) (citation omitted). As one court has summarized:

> For a method or system to be in "public use" within the meaning of 35 U.S.C. § 102(a) or (b), the method or system must be used in the ordinary course of business without active efforts to conceal its operation. *New Railhead Mfg. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1298-1300 (Fed. Cir. 2002) (finding that performance of the claimed method of drilling in rock at a commercial jobsite under public land, hidden from view, constituted public use); *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (finding that the defendant's use of the high-level aspects of its computer reservation system was a prior

9

> public use of a means-plus-function claim for a computer system); *Baxter Int'l v. COBE Labs.*, 88 F.3d 1054 (Fed. Cir. 1996) (finding that a scientist's use of a machine implementing the claimed method in a laboratory at the National Institute of Health, without the public's awareness of the method employed by the machine, was a prior public use); *see also Elec. Battery Co. v. Shimadzu*, 307 U.S. 5, 20, 59 S. Ct. 675, 83 L. Ed. 1071 (1939) ("The ordinary use of a machine or the practise [sic] of a process in a factory in the usual course of producing articles for commercial purposes is a public use"); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002) ("Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.").
>
> Cases in which courts find that a prior use was not a "public use" within the meaning of 35 U.S.C. § 102 have found active concealment of the method or system by the prior user, typically by contractual agreements to maintain secrecy. *See, e.g.*, *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (finding that company told all employees that the prior art machine was confidential and required them to sign confidentiality agreements, thus concealing the machine); *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376 (Fed. Cir. 2007) (finding that the prior art user was required to sign a non-disclosure agreement related to the prior art, thus concealing the prior art).

Advanceme Inc. v. RapidPay, LLC, 509 F. Supp. 2d 593, 608-09 (E.D. Tx. 2007) (alteration in original).

Here, CAT contends that the use of its OzCAT at a Tyson facility beginning in September 2005 was an invalidating public use under § 102(a). As the basis for its summary judgment motion on this issue, Morris claims that three confidentiality agreements along with the Tyson facility's being inaccessible to the public establish that the use of the OzCAT was secret and therefore did not invalidate the '173 patent. Two of the confidentiality agreements are similar in that a visitor to the Tyson facility must sign such an agreement to enter the facility and thereby agrees to keep in confidence information acquired while in the facility (i.e., Tyson's

10

trade secrets). (See Pl.'s Mem. Supp. Summ. J., Exs. C at 43, D, F, DE ## 77-6, 77-7, 77-11.) When CAT representatives met with Tyson on 22 March 2005 (when the purported enabling disclosure occurred, discussed supra) and on 31 May 2005 (when the purported commercial offer for sale of the OzCAT was delivered), they, as visitors, signed these confidentiality agreements. On 3 August 2005, Tyson and CAT entered into the third agreement, entitled "Confidentiality Agreement." (See Pl.'s Mem. Supp. Summ. J., Ex. I, DE # 77-14.) Tyson and CAT agreed to maintain each other's "Confidential Information" which might be disclosed "to each other for the purpose of determining whether the Parties are willing and/or able to enter into further transactions or business relationships relating to antimicrobial testing of ozone generating apparatus manufactured by Ozone Safe Foods." (Id.)

Considering all this evidence together does not necessarily lead one to the conclusion that no reasonable juror could find by clear and convincing evidence that a public use of the OzCAT did not occur. Differing, reasonable interpretations can be drawn from this evidence. As Judge Daniel recognized, the visitor confidentiality agreements are generic in nature. (M&R at 14.) It appears that Tyson required its visitors to execute these agreements to protect its own trade secrets, which the OzCAT was not. It is not clear from the face of the agreements that they cover the OzCAT. Although the 3 August 2005 Confidentiality Agreement clearly pertains to at least some portion of the project, it is not clear that it covers the OzCAT itself. Without more conclusive evidence, the court is unwilling to find, as a matter of law, that under no circumstances could CAT show by clear and convincing evidence a public use under § 102(a). Morris's objection is OVERRULED.

**C. Section 102(b)'s Public Use Bar**

11

In addition to the on sale bar, § 102(b) provides that "[a] person shall be entitled to a patent unless– the invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). CAT again relies on the purported "public use" of the OzCAT at the Tyson facility beginning in September 2005 as a basis for invalidating the '173 patent. However, because the court has determined above that summary judgment on the issue of "public use" is not appropriate, the only issue with regard to this invalidity contention is priority, i.e., whether the public use occurred more than one year prior to the patent application. Thus, the operative determination is the date of the patent application. Specifically, CAT "contends that the '173 patent is not entitled to the benefit of the filing date of the '203 Application (the provisional application) filed on June 13, 2006 and that therefore there was an invalidating public use of the invention under § 102(b) more than one year before the date of the '142 Application (the non-provisional application) [filed on 13 June 2007]." (Def.'s Obj., DE # 117, at 4-5.)

"'[F]or the non-provisional utility to be afforded the priority date of the provisional application, the two applications must share at least one common inventor and the written description of the provisional must adequately support the claims of the non-provisional application[.]'" (M&R at 15-16 (citation omitted) (alterations in original).) "[T]he specification of the provisional must 'contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms,' 35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the invention claimed in the non-provisional application." New Railhead, 298 F.3d at 1294.

CAT argues that the '203 application does not adequately support the claims of the '142

12

application because the terms "different composition" and "different content" are not adequately supported by the '203 application. In support of its motion for summary judgment, Morris relies on its expert, Shelly McKee, Ph.D., an associate professor, who teaches and researches on poultry meat and egg quality and safety and who opines that "the '203 provisional application does indeed support the elements of the '173 patent, including the claim elements of 'different composition' and 'different content.'" (Pl.'s Mem. Supp. Summ. J., Ex. P, DE # 77-22, ¶¶ 3, 5, 25.) In response, CAT argues that Morris has not shown that Dr. McKee is a person of ordinary, rather than extraordinary, skill in the art. (Def.'s Obj., DE # 117, at 6.) The court is not persuaded by this argument.

Accepting CAT's argument that Dr. McKee is a person of extraordinary skill, she still may offer an opinion on what a hypothetical person of ordinary skill would know and understand in reading the '203 application. See Duramed Pharm., Inc. v. Watson Labs., Inc., No. 2010-1331, 2011 WL 1086573, *6 (Fed. Cir. Mar. 25, 2011) ("[A] person of extraordinary skill may opine on the knowledge of this hypothetical person, *see Moore v. Wesbar Corp.*, 701 F.2d 1247, 1253 (7th Cir. 1983) (holding that an expert of 'more than the 'ordinary skill' required by the statute' was 'well suited to assist the court in deciding what would be obvious to such a person'). Accordingly, [the expert's] credentials as a tenured professor who actively participates in endocrinology research do not disqualify him from opining on what an ordinary person of lesser skill, whether a medical doctor with less research experience or a nurse practitioner, would have understood from the prior art." (alterations supplied)). In her declaration, Dr. McKee cites to a number of provisions in the '203 application which, she contends, support the concepts of "different composition" and "different content." (See Pl.'s Mem. Supp. Summ. J., Ex. P, DE #

13

77-22, ¶¶ 12, 15, 17, 21, 23.)  Her interpretation of two of these provisions specifically refers to what "one of ordinary skill in the art of poultry processing" would know.  (See id. ¶¶ 22, 24.)  That Dr. McKee does not couch all her interpretations in such manner, the court does not find fatal.  CAT has offered no evidence to contradict Dr. McKee's testimony.  Accordingly, Morris has met its summary judgment burden of showing that CAT has failed to produce clear and convincing evidence on an essential element of CAT's § 102(b) invalidity contention.

CAT's objection is OVERRULED, and the court will grant summary judgment in Morris's favor on the issue of whether the '173 patent is invalid pursuant to § 102(b)'s public use bar.

### D. Written Description Requirement of § 112, ¶ 1

"CAT contends that the claims of the '173 patent are invalid in violation of the written description requirement of 35 U.S.C. § 112, first paragraph."  (Def.'s Resp. Opp'n Summ. J., DE # 86, at 3 (footnote omitted).)

> The written description doctrine prohibits new matter from entering into claim amendments, particularly during the continuation process.  As this court stated in *In re Wright*[, 866 F.2d 422 (Fed. Cir. 1989)]:
>> When the scope of a claim has been changed by amendment in such a way as to justify an assertion that it is directed to a *different* invention than was the original claim, it is proper to inquire whether the newly claimed subject matter was *described* in the patent application when filed as the invention of the applicant.  That is the essence of the so-called "description requirement" of § 112, first paragraph.

Agilent Techs., Inc. v. Affymetrix, Inc., 567 F.3d 1366, 1379 (Fed. Cir. 2009) (citations omitted) (most alterations in original).

"In order to satisfy the written description requirement, the

14

>   disclosure as originally filed does not have to provide *in haec verba* support for the claimed subject matter at issue." Nonetheless, "the disclosure of the prior application must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention.'" That inquiry is a factual one and must be assessed on a case-by-case basis.

Yingbin-Nature (Guangdong) Wood Indus. Co. v. Int'l Trade Comm'n, 535 F.3d 1322, 1334-35 (Fed. Cir. 2008) (citations omitted) (alteration in original).

>   Moreover, in the context of a validity challenge based on new matter, the fact that the United States Patent and Trademark Office ("PTO") has allowed an amendment without objection "is entitled to an especially weighty presumption of correctness" in a subsequent validity challenge based on the alleged introduction of new matter.

Commonwealth Scientific & Indus. Research Org. v. Buffalo, 542 F.3d 1363, 1380 (Fed. Cir. 2008) (citation omitted).

Here, CAT argues that the original claims contained in the '142 application did not disclose, either explicitly or implicitly, "that the antimicrobial chemicals in the post chill decontamination tank are different chemical species than the antimicrobial chemicals in the chiller or that the antimicrobial chemicals in the post chill tank are at a lower concentration than the chemicals in the chiller." (Def.'s Resp. Opp'n Summ. J., DE # 86, at 26.) Thus, according to CAT, when Morris amended the '142 application to add the terms "different composition" and "different content" to certain claims, Morris introduced "new matter" in violation of the written description requirement of § 112, ¶ 1, and therefore, the '173 patent is invalid. It does not appear that Judge Daniel considered this precise issue.[3] Nonetheless, the court agrees with his ultimate

---

[3] Judge Daniel refers to the '203 provisional application, rather than the '142 application. (M&R at 19, 20.) Because the undersigned analyzes a different issue than Judge Daniel did regarding this invalidity contention, the
(continued...)

15

conclusion that CAT cannot prevail as a matter of law on its § 112 written description defense.

On 10 October 2008, after having filed preliminary amendments on 14 May 2008, Morris filed amendments to add the terms "different composition" and "different content" to claim that the solution in the post chill decontamination tank contains different chemicals than the chiller and contains chemicals of different strengths than the chiller. (See DE ## 88-7, 88-8.) CAT is correct that the terms "different composition" and "different content," contained in the amendments, are not used in the '142 application. (See DE # 88-9.) The application does, however, contain references to what the chemical solution in the post chill decontamination tank may be composed of or contain. It provides in relevant part:

> The decontamination tank is provided with mechanisms to assure a controlled treatment time for the birds in the liquid of the tank and to remove the birds from the tank after treatment at the proper dwell time. The process may include the application of liquid to the birds that has a higher concentration of chemicals than in the chiller. Typically, this liquid would include an increased concentration of decontamination substances, including chlorine, ozone, other common disinfectants or any of a number of proprietary treatment substances, or a combination of these, possibly in combination with suitable acids, caustics or buffers to control the pH of the solution. The more concentrated liquid may be further augmented by mechanical systems such as jets of liquid directed against the birds and movement of the birds through the liquid, or other means to enhance the liquid and mechanical agitation of the birds, with liquid contact with the efficacy of the biological agent.
> The post chill decontamination tank may be equipped with a control system for maintaining the chemical environment in the tank at the condition desired for effective bacterial decontamination. Also, since the post chill tank is much smaller than the chill tank, the more expensive chemicals may be used on a more economical basis in the post chill tank.

---

[3](...continued)
court does not adopt the pertinent portion of the M&R.

16

(Id.)

Although Dr. McKee's opinion concerns the '203 application, see supra, her testimony is also helpful to resolve the issue about the above-quoted language in the '142 application; some of the pertinent language used in the '142 application is identical or similar to language used in the '203 application. Because of the size differences in the post chill decontamination tank and the chiller and the dwell time of poultry in each unit, the chemicals for use in the post chill decontamination tank (identified in the above-quoted portion of the '142 application) must be different in composition and/or concentration from those chemicals used in the chiller. (See Pl.'s Mem. Supp. Summ. J., Ex. P, DE # 77-22, ¶ 13.) Further, Dr. McKee provided an opinion about the following statement which is quoted above from the '142 application and is also contained verbatim in the '203 application: "The post chill decontamination tank may be equipped with a control system for maintaining the chemical environment in the tank at the condition desired for effective bacterial decontamination." (Pl.'s Mem. Supp. Summ. J., Ex. O, DE # 77-21.) She declares that this statement

> indicates to me that the contents of the post chill decontamination tank would likely be different than those in the preceding chiller due to the post chill decontamination tank having its own chemical environment control system to achieve effective bacterial decontamination, which I also know will result in a more rapid bacterial reduction treatment solution than that in the chiller that typically comprises chilled water essentially.

(Pl.'s Mem. Supp. Summ. J., Ex. P, DE # 77-22, ¶ 14.) Based on the foregoing, the court finds that the amendments do not constitute new matter in violation of § 112's written description requirement.

Apparently, the PTO thought the same way. In response to the subject amendments, on

17

18 November 2008, the PTO issued a Notice of Allowability, thereby allowing the claims as amended. (See DE # 94-7.) CAT has offered no evidence to refute the presumptive correctness of the PTO's action, and its objection is OVERRULED. Accordingly, the court finds that summary judgment in favor of Morris is appropriate on this defense.

## IV.  CONCLUSION

All objections to the M&R are OVERRULED. Morris's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The court finds as a matter of law that the '173 patent is not invalid under the public use bar of 35 U.S.C. § 102(b) or the written description requirement of 35 U.S.C. § 112, ¶ 1. Except as noted herein, the court ADOPTS the M&R as its own. The case is REFERRED to Judge Daniel to conduct a status conference on any remaining issues, namely whether the parties desire the court to proceed with claim construction.

This 29 June 2011.

W. Earl Britt  
Senior U.S. District Judge